**COMMONWEALTH OF the NORTHERN MARIANA ISLANDS, Plaintiff-Appellant,**

v.

**Daniel ATALIG, Defendant-Appellee.**

**No. 83–1094X.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 15, 1983.

Decided Jan. 11, 1984.

---

Rexford C. Kosack, Saipan, CM, Peter Donnici, San Francisco, Cal., for plaintiff-appellant.

William M. Fitzgerald, Saipan, CM, for defendant-appellee.

Jacques B. Gelin, Washington, D.C., for intervenor, United States.

Before WALLACE, SNEED and ANDERSON, Circuit Judges.

SNEED, Circuit Judge:

This case raises issues concerning the appellate jurisdiction of this court and the application of the Sixth and Fourteenth Amendments to a trust territory.

A commonwealth trial court of the Northern Mariana Islands convicted Daniel Atalig of possession of marijuana in violation of local law. The Appellate Division of the District Court for the Northern Mariana Islands reversed the conviction on the grounds that Atalig was denied the right to trial by jury guaranteed by the Sixth and Fourteenth Amendments to the Constitution. We reverse the judgment of the district court.

## I.

### FACTS AND PROCEEDINGS BELOW

Appellee Daniel Atalig is a citizen of the Trust Territory of the Pacific Islands who resides on the island of Rota, one of the

Northern Mariana Islands.[1] Atalig rode as a passenger and shipped two boxes as cargo on a commercial airline flight from Rota to Saipan. When he arrived in Saipan, Atalig recovered the boxes from the cargo claim area and presented them to an agricultural quarantine inspector. Atalig opened the boxes and the inspector discovered plastic bags filled with approximately five pounds of marijuana.

Appellant Commonwealth of the Northern Mariana Islands (Commonwealth or NMI) charged Atalig by information with possession of marijuana in violation of 63 Trust Territory Code § 292(3)(c). The maximum penalty for violating this section is one years imprisonment, a $1,000 fine, or both. The NMI provides jury trials in criminal cases only for offenses punishable by more than five years imprisonment or a $2,000 fine. 5 Trust Territory Code § 501(1). A commonwealth trial court denied Atalig's demand for trial by jury and his motion to suppress the marijuana. Atalig subsequently entered a plea of nolo contendere. The trial court convicted Atalig and sentenced him to one year probation with special conditions that he serve thirty days in jail and pay a $1,000 fine.

Atalig appealed his conviction to the Appellate Division of the United States District Court for the Northern Mariana Islands.[2] The appellate division held that *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), and *Baldwin v. New York,* 399 U.S. 66, 90 S.Ct. 1886 (1970), require trial by jury in prosecutions in commonwealth courts for serious criminal offenses. Section 501 of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States (Covenant) and 5 Trust Territory Code § 501(1) are unconstitutional, the appellate division held, to the extent that they deny the right to jury trial.

## II.

## ISSUES

This case presents two issues on appeal.

1. Whether this court has jurisdiction to hear an appeal by the NMI in a criminal case reviewed by the appellate division.

2. Whether section 501 of the Covenant and 5 Trust Territory Code § 501(1) violate the Sixth and Fourteenth Amendments to the Constitution.

## III.

## THE RELATIONSHIP BETWEEN THE NMI AND THE UNITED STATES

The resolution of these issues requires an understanding of the unique political relationship between the NMI and the United States. The NMI is part of the Trust Territory of the Pacific Islands, which the United States has administered as a United Nations Trusteeship since 1947. *See Gale v. Andrus,* 643 F.2d 826, 828–30 (D.C.Cir. 1980).[3] The United States exercises powers of administration, legislation, and jurisdiction in the Trust Territory under the general supervision of the United Nations Security Council. *See* Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, art. 3, 61 Stat. 3301, T.I.A.S. No. 1665, 8 U.N.T.S. 189 [hereinafter cited as Trusteeship Agreement]. However, the United States does not possess sovereignty over the Territory. *See, e.g., Gale,* 643 F.2d at 832; *McComish v. C.I.R.,* 580 F.2d 1323, 1330 (9th Cir.1978). Its authority is circumscribed by the Trusteeship Agreement. *See In re Bowoon Sangsa Co.,* 720 F.2d 595, 599–600 (9th Cir.1983); *Gale,* 643 F.2d at 830. Article 6 of the Trusteeship Agree-

---

1. The Northern Mariana Islands consist of sixteen small islands located north of Guam. Although the islands extend over several thousand square miles of the Pacific Ocean, their total land area is less than 200 square miles. Nearly all of the approximately 17,000 inhabitants live on three major islands: Saipan, Rota, and Tinian.

2. The district court had jurisdiction over Atalig's appeal based on 48 U.S.C. § 1694b.

3. The Trust Territory includes over 2,000 islands and atolls in the Western Pacific Ocean. Between World Wars I and II they were governed by Japan under a League of Nations mandate. *Gale,* 643 F.2d at 828.

ment directs the United States to "promote the development of the inhabitants of the trust territory toward self-government or independence," according to the "freely expressed wishes of the peoples concerned." Trusteeship Agreement, *supra,* art. 6(1).[4]

Negotiations to determine the future status of the Trust Territory continued for more than a decade. In 1972, the United States agreed to conduct separate negotiations with the NMI.[5] These negotiations culminated in the signing, on February 15, 1975, of the covenant to grant the NMI commonwealth status. The legislature of the NMI unanimously endorsed the Covenant, and the people of the NMI themselves approved the agreement by a seventy-eight percent vote on June 17, 1975.[6] Congress thereafter enacted the Covenant as law. Joint Resolution of March 24, 1976, Pub.L. No. 94–241, 90 Stat. 263, *reprinted in* 48 U.S.C. § 1681 note.

The Covenant consists of ten articles that define the political relationship between the NMI and the United States. Pursuant to Covenant section 101, the NMI will become a self-governing commonwealth under United States sovereignty upon termination of the trusteeship. Although the trusteeship continues, most of the Covenant is already in effect.[7] Since January 9, 1978, a three branch commonwealth government has operated under a locally drafted and ratified NMI constitution. The local constitution and various Covenant provisions took effect on that date pursuant to a presidential proclamation. *See* Proclamation No. 4534, 42 Fed.Reg. 56593 (1977), *reprinted in* 48 U.S.C. § 1681 note.

One of the operative Covenant provisions is section 501, which concerns the application of the United States Constitution in the NMI. Section 501(a) provides in pertinent part:

To the extent that they are not applicable of their own force, the following provisions of the Constitution of the United States will be applicable within the Northern Mariana Islands as if the Northern Mariana Islands were one of the several states... Amendments 1 through 9, inclusive; ... Amendment 14, section 1; ... provided, however, that *neither trial by jury nor indictment by grand jury shall be required in any civil action or criminal prosecution based on local law,* except where required by local law. (emphasis added).

Covenant section 501(b) authorizes Congress to approve section 501(a):

The applicability of certain provisions of the Constitution of the United States to the Northern Mariana Islands will be without prejudice to the validity of and the power of the Congress of the United States to consent to sections 203, 506 and 805 and the proviso in Subsection (2) of this Section.

The sections specified in section 501(b) are an integral part of the agreement defining the political relationship between the NMI and the United States. The drafters of the Covenant noted that without these provisions, "the accession of the Northern Mariana Islands to the United States would not have been possible." Marianas Political Status Commission, Report of the Joint

---

4. *See also In re Bowoon Sangsa Co.,* 720 F.2d at 599–600; *Gale,* 643 F.2d at 830.

5. Between September 1969 and April 1972 the NMI and the other areas of the Trust Territory collectively negotiated with the United States concerning the future status of the Trust Territory. The NMI entered separate status negotiations when the other areas decided to pursue the more autonomous relationship of "free association." *See* S.Rep. No. 596, 94th Cong., 2d Sess. 4–5 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 448, 452; S.Rep. No. 433, 94th Cong., 1st Sess. 42–54 (1975).

For a discussion of the difference between commonwealth status and free association, *see In re Bowoon Sangsa Co.,* 720 F.2d at 600.

6. S.Rep. No. 433, *supra* note 5, at 63–64; *id.* at 413–14 (letter to President Ford from United States Plebiscite Commissioner).

7. *See* Covenant § 1003. The trusteeship continues pending the conclusion of negotiations with the other areas of the Trust Territory. The United States had hoped to conclude these negotiations and to terminate the trusteeship by 1981. S.Rep. No. 433, *supra* note 5, at 65; *id.* at 102 (letter from President Ford).

Drafting Committee 3 (1975).[8] The importance of section 501 is underscored by section 105, which provides that section 501 may be modified only if the governments of both the NMI and the United States consent.[9]

The Covenant leaves to the NMI legislature the determination whether trials under local law will be before juries. This flexibility permits the local legislature to mold the procedures in the NMI courts to fit local conditions and experience.[10] The NMI constitution drafted and approved pursuant to Covenant section 201 similarly declares that "[t]he legislature may provide for trial by jury in criminal or civil cases." NMI Const. art. I, § 8.

The applicable local law governing trial by jury in criminal cases is 5 Trust Territory Code § 501(1).[11] That statute provides in pertinent part:

> Any person accused by information of committing a felony punishable by more than five years imprisonment or by more than two thousand dollars fine, or both, shall be entitled to a trial by jury of six persons.

## IV.

### APPELLATE JURISDICTION

■ Appellee Atalig challenges the jurisdiction of this court to hear an appeal by the NMI in a criminal case reviewed by the appellate division of the district court. We hold that *Arizona v. Manypenny*, 451 U.S. 232, 101 S.Ct. 1657, 68 L.Ed.2d 58 (1981), and pertinent provisions of the Covenant and local law establish our jurisdiction.

*Manypenny* considered the statutory authority necessary for a state to appeal in a criminal proceeding removed to federal court pursuant to 28 U.S.C. § 1442(a)(1). The state sought to appeal from an order of acquittal entered after the conviction of the defendant. Although state law would have permitted such an appeal within the state court system, no statute expressly authorized the state to appeal from the federal district court to the federal court of appeals.

In order for the state to appeal, the Court found that two requirements must be satisfied. First, there must be some federal basis for appellate jurisdiction independent of the removal statute. 451 U.S. at 244, 101 S.Ct. at 1665. The Court held that 28 U.S.C. § 1291, the general statutory grant of appellate jurisdiction, provides such a basis. *Id.* at 249, 101 S.Ct. at 1668. Second, state law must authorize appeal by the prosecutor in criminal proceedings. *Ibid.* Because this requirement was also satisfied, the court concluded that the federal court of appeals had jurisdiction over the state's appeal. *Id.* at 250, 101 S.Ct. at 1669.

*Manypenny* provides a reliable guide for determining our jurisdiction in this case. First, there exists a federal basis for our appellate jurisdiction. 28 U.S.C. § 1291 and 48 U.S.C. § 1694c(b) establish our jurisdiction over appeals from the appellate division of the district court. *See Camacho v. Civil Service Commission,* 666 F.2d 1257,

---

**8.** *Reprinted in Hearing to Approve "The Covenant to Establish a Commonwealth of the Northern Mariana Islands" Before the Subcomm. on Territorial and Insular Affairs of the House Comm. on Interior and Insular Affairs,* 94th Cong., 1st Sess. 376 (1975) [hereinafter cited as *House Hearing*]. *See also* Marianas Political Status Commission, Section-By-Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands (1975), *reprinted in House Hearing, supra,* at 640.

**9.** Covenant section 105 provides in pertinent part: .

> In order to respect the right of self-government guaranteed by the Covenant the United

States agrees to limit the exercise of [its legislative] authority so that the fundamental provisions of this Covenant, namely Articles I, II and III and Sections 501 and 805, may be modified only with the consent of the Government of the United States and the Government of the Northern Mariana Islands.

**10.** Section-By-Section Analysis, *supra* note 8, at 639–40.

**11.** The Trust Territory Code continues to apply in the NMI until amended or repealed by the Commonwealth government. *See* Covenant § 505.

1259–61 (9th Cir.1982).[12] Second, local law authorizes the NMI to appeal in criminal cases such as this. 6 Trust Territory Code § 353 provides:

> In a criminal case, the government shall have the right of appeal only when a written enactment intended to have the force and effect of law has been held invalid.[13]

We are mindful of *Guam v. Okada,* 694 F.2d 565 (9th Cir.1982), which held that the government of Guam lacks statutory authority to appeal in criminal cases reviewed by the Appellate Division of the District Court of Guam.[14] In *Okada* we observed that Congress, which has plenary power over Guam, has implicitly denied Guam the power to legislate procedure in the district court. 694 F.2d at 568–69. We concluded that only Congress, and not the Guam legislature, has power to authorize appeals from the district court.

*Okada* is not controlling here because of the unique political status of the NMI. *Cf. Barusch v. Calvo,* 685 F.2d 1199, 1202 (9th Cir.1982) (distinguishing the NMI from United States territories for purposes of border searches). Guam is subject to the plenary power of Congress and has no inherent right to govern itself. *Okada,* 694 F.2d at 568. In contrast, the NMI possesses a right to self-government acknowledged in the Trusteeship Agreement and the Covenant. *See supra* Part II. This distinction suggests that the NMI legislature, like that of a state, has power to provide statutory authority for government appeals to this court in criminal cases.[15] Moreover, unlike *Okada,* we find no indication that Congress intended to preclude the local government from authorizing appeals from the district court.[16] We conclude that we have jurisdiction to hear this appeal. *Manypenny,* not *Okada,* is the apposite authority.

---

**12.** 48 U.S.C. § 1694c(b) provides that the provisions of Title 28 which apply to the District Court of Guam shall also apply to the District Court for the NMI, except as otherwise provided by Article IV of the Covenant. 28 U.S.C. § 1291 gives this court jurisdiction over appeals from the District Court of Guam.

**13.** *See also* 6 Trust Territory Code § 355(3), which provides:

> If the government has appealed in a criminal case as authorized in Section 353 of this Chapter, the appellate or reviewing court may not reverse any finding of not guilty, and its powers shall be limited to a reversal of any determination of invalidity of an enactment intended to have the force of law.

**14.** In both Guam and the NMI the local legislature is authorized to determine the district court's appellate jurisdiction over local courts. 48 U.S.C. § 1424(a); *id.* § 1694b. This court's jurisdiction over the district courts in Guam and the NMI is generally determined by 28 U.S.C. § 1291, which by itself does not authorize appeals by the government in criminal cases.

**15.** The inquiry under *Manypenny* focuses on whether "the legislature responsible for [the exercise of prosecutorial] power has spoken in express terms." 451 U.S. at 249, 101 S.Ct. at 1668. There is no requirement of express authorization by *Congress* when the sovereign seeking to appeal is a state rather than the federal government. *Id.* at 248, 101 S.Ct. at

1667. Nor do we think such a requirement exists for an appeal by the government of the NMI. *Cf.* Section-By-Section Analysis, *supra* note 8, at 629 ("A territory is merely part of the United States Government and is subject to the direction of the Congress and Executive Branch of the government. The Northern Mariana Islands government will be an independent government, like that of the states.")

**16.** In *Okada* we noted that 48 U.S.C. § 1424(b) provides that the federal rules of procedure shall apply "to the District Court of Guam and appeals therefrom." 694 F.2d at 569. We inferred that this section bars Guam from regulating procedure in the district court and therefore the Guam legislature has no power to authorize government appeals from that court.

48 U.S.C. § 1694(c) applies the federal rules of procedure "to the District Court for the Northern Mariana Islands and appeals therefrom where appropriate, and except as otherwise provided in articles IV and V of the covenant. . . ." This language does not prevent the NMI legislature from authorizing government appeals from the district court. In contrast to the unqualified scope of § 1424(b), § 1694(c) applies the federal rules "where appropriate" and subject to the provisions of the Covenant. 6 Trust Territory Code § 353, which authorizes appeal by the NMI in criminal cases, remains in force by virtue of Covenant § 505. Indeed, by enacting Covenant § 505, Congress could itself be viewed to have implicitly authorized appeals by the NMI from judgments of the district court.

## V.

## THE CONSTITUTIONALITY OF THE NMI'S PROVISIONS FOR TRIAL BY JURY IN CRIMINAL CASES

We now turn to the second issue we must confront. In accord with the negotiated agreement defining the political relationship between the NMI and the United States, the NMI has determined to provide jury trials in criminal cases only if the offense is punishable by more than five years imprisonment or a $2,000 fine. We, therefore, must decide if this limitation on trial by jury violates the Constitution notwithstanding the Covenant. That is, to what extent does the Sixth Amendment right to jury trial apply in the NMI independent of any action by Congress.

At the outset we reject two possible approaches to this problem. First, we could maintain that the entire Constitution applies by its own force—ex *proprio vigore* —in any place where the United States functions as a sovereign. Second, we could maintain that the Constitution applies in the NMI only to the extent provided for and agreed to in the Covenant. Covenant section 501 would therefore bar any challenge to the NMI's procedures based on the Sixth Amendment right to trial by jury. We believe that a line of decisions known as

the *Insular Cases* suggests that neither of these approaches is appropriate.[17] The first is too broad while the second is too narrow.

The *Insular Cases* suggest a middle way. They and their progeny confronted the problem with which we are concerned.[18] The acquisition of Hawaii, the Philippines, and Puerto Rico at the close of the nineteenth century presented the issue whether the Constitution applies in such territories independent of action by Congress.[19] The doctrine of "territorial incorporation" announced in the *Insular Cases* distinguishes between incorporated territories, which are intended for statehood from the time of acquisition and in which the entire Constitution applies ex *proprio vigore*, and unincorporated territories, which are not intended for statehood and in which only fundamental constitutional rights apply by their own force. *Examining Board v. Flores de Otero*, 426 U.S. 572, 599–600 n. 30, 96 S.Ct. 2264, 2280 n. 30, 49 L.Ed.2d 65 (1976).[20] The *Insular Cases* held that the Fifth Amendment right to grand jury indictment and the Sixth Amendment right to trial by jury are nonfundamental rights that do not apply in unincorporated territories. *E.g., Balzac v. Porto Rico*, 258 U.S. 298, 309, 42 S.Ct. 343, 347, 66 L.Ed. 627 (1922); *Dorr v. United States*, 195 U.S. 138, 149, 24 S.Ct. 808,

17. In analyzing the Covenant provisions concerning jury trial and grand jury indictment, Congress specifically noted the *Insular Cases*. S.Rep. No. 433, *supra* note 5, at 74. Congress also observed that similar limitations on jury trial and grand jury indictment exist with respect to Guam (48 U.S.C. § 1424(b)) and the Virgin Islands (48 U.S.C. §§ 1561, 1616). *Ibid.*

18. *E.g., Balzac v. Porto Rico*, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922); *Dorr v. United States*, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); *Hawaii v. Mankichi*, 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 1016 (1903); *Downes v. Bidwell*, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901).

19. *See generally* Coudert, *The Evolution of the Doctrine of Territorial Incorporation*, 26 Colum. L.Rev. 823 (1926).

20. The doctrine of territorial incorporation emerged as an alternative to the two other approaches noted previously. Some Justices argued that the only constitutional restraints applicable in the territories were those extend-

ed by Congress. *See Downes v. Bidwell*, 182 U.S. 244, 250–51, 21 S.Ct. 770, 772–73, 45 L.Ed. 1088 (1901) (plurality opinion of Brown, J.). Others maintained that the entire Constitution applies ex *proprio vigore* in any place subject to the sovereignty of the United States. *See Hawaii v. Mankichi*, 190 U.S. 197, 240, 23 S.Ct. 787, 799, 47 L.Ed. 1016 (1903) (Harlan, J., dissenting); *Downes*, 182 U.S. at 378, 21 S.Ct. at 822 (Harlan, J., dissenting). This view continues to have its adherents, but it has never commanded a majority of the Court. *See Harris v. Rosario*, 446 U.S. 651, 653–54, 100 S.Ct. 1929, 1930–31, 64 L.Ed.2d 587 (1980) (dissenting opinion of Marshall, J.); *Torres v. Puerto Rico*, 442 U.S. 465, 475–76, 99 S.Ct. 2425, 2431–32, 61 L.Ed.2d 1 (1979) (concurring opinion of Brennan, J.); *cf. Reid v. Covert*, 354 U.S. 1, 8–9, 14, 77 S.Ct. 1222, 1226–27, 1229, 1 L.Ed.2d 1148 (1957) (plurality opinion of Black, J.) (suggesting that all constitutional restraints apply to United States government wherever it acts).

813, 49 L.Ed. 128 (1904); *Hawaii v. Manki-chi,* 190 U.S. 197, 216–18, 23 S.Ct. 787, 790–91, 47 L.Ed. 1016 (1903).

The appellate division of the district court adopted the analytic framework of the *Insular Cases* and treated the NMI as an unincorporated territory for the purposes of applying the Constitution. Nonetheless, fundamental rights, the appellate division maintained, must be the same for purposes of applying the Bill of Rights to the states and applying the Constitution to unincorporated territories. It relied on *Duncan v. Louisiana,* 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), which held that in state prosecutions for serious criminal offenses the right to jury trial is a fundamental constitutional right incorporated by the Due Process Clause of the Fourteenth Amendment.[21] *Duncan,* the appellate division concluded, "unmistakably repudiated" the doctrine of the *Insular Cases* that trial by jury is not a fundamental right applicable in unincorporated territories.[22]

We disagree and reject the conclusion that *Duncan* requires that Covenant section 501 and 5 Trust Territory Code § 501(1) be held to violate the Constitution. To focus on the label "fundamental rights," overlooks the fact that the doctrine of incorporation for purposes of applying the Bill of Rights to the states serves one end while the doctrine of territorial incorporation serves a related but distinctly different one. The former serves to fix our basic federal structure; the latter is designed to limit the power of Congress to administer territories under Article IV of the Constitution.[23] Legal doctrines, Justice Frankfurter observed, "derive meaning and content from the circumstances that gave rise to them and from the purposes they were designed to serve. To these they are bound as is a live tree to its roots." *Reid v. Covert,* 354 U.S. 1, 50, 77 S.Ct. 1222, 1248, 1 L.Ed.2d 1148 (Frankfurter, J., concurring).

*Duncan* altered the basic federal structure by adopting a new definition of fundamental rights for the purpose of applying the Bill of Rights to the states. Previously, the inquiry had been whether "a civilized system could be imagined that would not accord the particular protection." The new approach only asks whether "a procedure is necessary to an *Anglo-American* regime of ordered liberty." 391 U.S. at 149–50 n. 14, 88 S.Ct. at 1447–48 n. 14 (emphasis added); *see also Benton v. Maryland,* 395 U.S. 784, 794–96, 89 S.Ct. 2056, 2062–64, 23 L.Ed.2d 707 (1969). In holding that the Sixth Amendment guarantee of trial by jury is a fundamental right incorporated by the Fourteenth Amendment, the Court noted that the procedure had a long history in English and American law and that every state afforded jury trials in serious criminal cases. 391 U.S. at 151–54, 88 S.Ct. at 1448–50. Although the Court concluded that "trial by jury in criminal cases is fundamental to the American scheme of justice," *id.* at 149, 88 S.Ct. at 1447, it recognized that "[a] criminal process which was fair and

---

**21.** In *Baldwin v. New York,* 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970) the Court held that the right to jury trial attaches to offenses punishable by more than six months imprisonment.

**22.** The district court also found that *Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) seriously eroded the holding of the *Insular Cases. Reid* held that civilian United States citizens may not be tried for capital offenses in military courts overseas. Court martial proceedings, the Court held, impermissibly deny civilian defendants the right to be tried by a jury after grand jury indictment. In distinguishing the *Insular Cases,* Justice Black's plurality opinion declared that "neither the cases nor their reasoning should be given any further expansion." 354 U.S. at 14, 77 S.Ct. at 1229.

We think the district court exaggerated *Reid's* effect on the *Insular Cases.* First, the broad language in Justice Black's opinion was not endorsed by a majority of the Court. Second, *Reid* concerned the government's power to extend military jurisdiction to civilian citizens; in contrast, the *Insular Cases* considered the power of Congress to govern insular territories. *See* 354 U.S. at 13–14, 77 S.Ct. at 1228–1229; *id.* at 51–54, 77 S.Ct. at 1248–1250 (Frankfurter, J., concurring).

**23.** Article IV, section 3 grants Congress the power "to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States."

equitable but used no juries is easy to imagine." *Id.* at 150 n. 14, 88 S.Ct. at 1448 n. 14.

■ We believe the NMI's present rules regulating jury trials can easily fit within the reach of the Court's imagination. The *Insular Cases* acknowledged that traditional Anglo-American procedures such as jury trial might be inappropriate in territories having cultures, traditions and institutions different from our own. *Dorr,* 195 U.S. at 148, 24 S.Ct. at 812; *Balzac,* 258 U.S. at 310, 42 S.Ct. at 347. In identifying "fundamental rights" for purposes of territorial incorporation, the Court considered whether the asserted right was one of "those fundamental limitations in favor of personal rights" which are "the basis of all free government." *See Dorr,* 195 U.S. at 146, 147, 24 S.Ct. at 811, 812. This approach allowed the Court to afford Congress flexibility in administering offshore territories and to avoid imposition of the jury system on peoples unaccustomed to common law traditions. *See id.* at 148, 24 S.Ct. at 812; *see also Torres v. Puerto Rico,* 442 U.S. 465, 469, 99 S.Ct. 2425, 2428, 61 L.Ed.2d 1 (1979). To employ *Duncan's* approach would deprive Congress of that flexibility. Accommodation of the particular social and cultural conditions of areas such as the NMI would be difficult if not impossible.

The history of incorporation of the Bill of Rights under the Due Process Clause also makes us reluctant to apply *Duncan* to the *Insular Cases.* That history reveals that the Court proceeded cautiously with this incorporation. Through this gradual process in the century following ratification of the Fourteenth Amendment, nearly all the rights guaranteed in the Bill of Rights have been found applicable to the states.[24] We believe that a cautious approach is also appropriate in restricting the power of Congress to administer overseas territories. Were we to apply sweepingly *Duncan's* definition of "fundamental rights" to unincorporated territories, the effect would be immediately to extend almost the entire Bill of Rights to such territories. This would repudiate the *Insular Cases.* We are not prepared to do so nor do we think we are required to do so.[25]

Covenant section 501 and 5 Trust Territory Code § 501(1), therefore, do not violate either the Sixth or Fourteenth Amendments to the Constitution.[26] We recognize that the NMI does not dispense entirely with trial by jury in criminal cases and that both the Covenant and the NMI Constitution provide criminal defendants with the other procedural safeguards guaranteed by the Bill of Rights.[27] We also note that the

---

24. *See, e.g., Duncan,* 391 U.S. at 148, 88 S.Ct. at 1446–47 (listing cases that incorporated various rights guaranteed by the Bill of Rights).

25. As noted, we believe that *Duncan* and *Reid* do not modify the holding of the *Insular Cases* concerning trial by jury. *Accord King v. Morton,* 520 F.2d 1140, 1147 (D.C.Cir.1975) (dicta). The district court also relied on *United States v. Tiede,* 86 F.R.D. 227 (U.S.C. Berlin 1979), which held that alien civilians must be afforded trial by jury in the United States Court for Berlin. Because *Tiede* concerned trials in a federal court, we do not think it controls this case. *Tiede* also asserted that *Duncan* voided the premise of the *Insular Cases.* 86 F.R.D. at 252. We disagree. *Cf. United States v. Christian,* 660 F.2d 892, 898–99 (3d Cir.1981) (relying on *Insular Cases* for proposition that Fifth Amendment grand jury requirement does not apply in the Virgin Islands); *Government of the Canal Zone v. Scott,* 502 F.2d 566, 568 (5th Cir.1974) (same proposition with respect to the Canal Zone).

26. The district court also noted that *Balzac v. Porto Rico* declared that due process is a fundamental right applicable in unincorporated territories. 258 U.S. at 313, 42 S.Ct. at 348. Because *Duncan* held that jury trial is one of the protections afforded by the Due Process Clause of the Fourteenth Amendment, the district court concluded that the NMI must provide trial by jury in criminal cases. This argument is unconvincing because it confuses *Balzac's* reference to due process in the procedural sense with the use of the Due Process Clause to make specific rights guaranteed by the Bill of Rights applicable to the states.

27. Covenant section 501 provides that except for the rights to jury trial and grand jury indictment, each of the first nine Amendments and section 1 of the Fourteenth Amendment will apply in the NMI. Article I, section 4 of the NMI Constitution provides:

In all criminal prosecutions certain fundamental rights shall obtain.

NMI's elimination of jury trials is applicable only to trials in commonwealth courts. Finally, we point out that we do not reach the argument that the Constitution applies with even less force in the NMI than in an unincorporated territory.[28] That is, we do not address the question whether for the purposes of this case the NMI should be treated as neither an incorporated nor an unincorporated territory.

## VI.

### THE FOURTH AMENDMENT ISSUE

In addition to his demand for jury trial, Atalig argued before the district court that the trial court erroneously denied his motion to suppress the marijuana discovered at the airport. The district court did not reach this issue. In light of our disposition of this appeal, the district court should consider Atalig's Fourth Amendment claim on remand.

REVERSED and REMANDED.

a) The accused has the right to assistance of counsel and, if convicted, has the right to counsel in all appeals.
b) The accused has the right to be confronted with adverse witnesses and to have compulsory process for obtaining favorable witnesses.
c) No person shall be compelled to give self-incriminating testimony.
d) There shall be a speedy and public trial.
e) No person shall be put twice in jeopardy for the same offense regardless of the governmental entity that first institutes prosecution.
f) Excessive bail shall not be required.
g) Excessive fines shall not be imposed.
h) Cruel and unusual punishment shall not be inflicted.
i) Capital punishment is prohibited.
j) Persons who are under eighteen years of age shall be protected in criminal judicial proceedings and in conditions of imprisonment.

Article I, section V of the NMI Constitution provides that "[n]o person shall be deprived of life, liberty, or property without due process of law."

28. The NMI argues that its political status is distinct from that of unincorporated territories such as Puerto Rico. This argument is credible. Under the trusteeship agreement, the United States does not possess sovereignty over the NMI. As a commonwealth, the NMI will enjoy a right to self-government guaranteed by the mutual consent provisions of the Covenant. *See supra,* note 9. No similar guarantees have been made to Puerto Rico or any other territory. Section-By-Section Analysis, *supra* note 8, at 631.

Thus, there is merit to the argument that the NMI is different from areas previously treated as unincorporated territories. We need not decide this issue because the independent force of the Constitution is certainly no greater in the NMI than in an unincorporated territory.