BARBARA BANKS, Plaintiff

v.

AMERICAN SAMOA GOVERNMENT, Defendant

High Court of American Samoa
Trial Division

CA No. 129-85

May 7, 1987

Before REES, Chief Justice, LUALEMAGA, Associate Judge, and VAIVAO, Associate Judge.

Counsel: For Plaintiff, William Reardon
         For Defendant, Donald Griesmann, Assistant
         Attorney General

In May 1985 the plaintiff was hired by the American Samoa Government. In October of the same year she was discharged. The circumstances of her hiring and firing illustrate all of the major difficulties --- the increasing dependence of an insular people on outside resources, the frequent misunderstanding and occasional hostility between Samoans and others who have come here to live, the vagueness of the political relationship with the United States, and the consequent uncertainty about the rules by which disputes are to be resolved--- that face American Samoa today.

## I.  Facts and Legal Background

Barbara Banks came to American Samoa in 1984 with her husband, who had been hired by the government (hereinafter ASG) to serve as Director of Vocational Rehabilitation for a two-year term. Mrs. Banks herself had been employed in the field of vocational rehabilitation for some years. About two months after her arrival in the Territory she began looking for a job.

Mrs. Banks was assisted in her search for employment by her husband. He approached Adele Fritz soon after her appointment as Director of Manpower Resources (the territory's chief personnel officer) to discuss two things: (1) the forthcoming creation of the position of Executive Director of a vocational rehabilitation co-ordinating committee called the Developmental Disabilities Planning Council (hereinafter DDPC); and (2) his wife's unhappiness at not working in her chosen field of vocational rehabilitation.

Shortly thereafter the hiring process for the DDPC Executive Director began. An advertisement was placed in the Government Bulletin (a daily newspaper or newsletter then published by ASG) and a number of applications were received, including one from Mrs. Banks.

Three persons were certified by the Office of Manpower Resources (OMR) as qualified for the

position.    Two  of  these  people, Mrs. Banks and
Penei Sewell, were interviewed  by the three-member
hiring committee of the DDPC.   The third candidate,
James  Mailo,  was   not   interviewed,  apparently
because his papers were inadvertently not forwarded
to the committee.   On April 11, 1985, the committee
suggested  to  the  full  DDPC membership that both
candidates were well qualified  and that  one ought
to be  hired as executive director and the other as
a  consultant  to  the  DDPC.    It  was  generally
understood  that  the  committee  had Mr. Sewell in
mind as  the executive  director and  Mrs. Banks as
the consultant.

        This  recommendation  was  opposed by the DDPC
chairman, who was none  other than  Mr. Banks.   At
the next  meeting he  informed the  DDPC members of
Mr.  Mailo's  application,  and  the  committee was
directed to interview Mr. Mailo.   The committee did
so.   On May  7 the  committee again  recommended to
the  full  DDPC that  Mr.  Sewell  be  hired.   Mr.
Banks's response was, "We  can't have  that."  The
stated ground for his opposition was that since the
committee  had  not  been  aware  of   Mr.  Mailo's
application  until  it  had  been  called  to their
attention,  there  might  be  yet  other  qualified
applicants  who  had not  been interviewed.  He also
suggested that  the  Territory  might  lose federal
funds  if  the  position  were  not advertised more
widely.   This was  an  apparent  reference  to
regulations  designed  to  ensure  that handicapped
people were informed of available positions  in the
field of vocational rehabilitation.   The DDPC voted
to readvertise the position.

        At the conclusion of  the  May  7  meeting Mr.
Banks resigned  the chairmanship,  citing the press
of other responsibilities.  He did,  however, write
a  letter  the  next  day to the Office of Manpower
Resources requesting on behalf of the DDPC that the
position  be   readvertised.     The  position  was
readvertised,   more   people   applied   and  were
interviewed, and  Mrs. Banks was hired.   Mr. Sewell
then  brought  a  grievance  before  the  Personnel
Advisory Board  (PAB), a committee appointed by the
Governor  to  make  recommendations  in  personnel
disputes.   His grievance  charged that the initial
process resulting in the recommendation of  his own
employment  had  been  procedurally valid; that Mr.
Banks had manipulated  the  process  to  secure the
employment of  Mrs. Banks; and that he, Sewell, had
been discriminated against because he was  a Samoan
and  the  majority  of  the  DDPC  members  who

116

participated in the second hiring process were non-Samoans.

The PAB rejected Mr. Sewell's claim of racial discrimination, but did find that the initial procedure had been valid, that the decision to "thwart the initial hiring process was irresponsible" and "made a mockery of career service procedures," and that Mr. Banks's involvement was "highly suspect." The PAB further concluded that Mrs. Banks was more suited to serve as a consultant than as executive director because she "was unable to inform the Board whether she will . . . leave her position in 18 to 20 months when her husband's employment ends." There was also a statement in the PAB opinion that the second hiring process had "served only to deny Mr. Sewell of his right as an American Samoan to be employed." The PAB, despite its status as an advisory committee, concluded by announcing a "decision" that Mr. Sewell "shall be employed" as DDPC executive director.

The Director of Manpower Resources, Mrs. Fritz, who had been the defendant in the grievance process, filed a motion for reconsideration of the PAB decision. The motion was filed by Assistant Attorney General Phyllis Coven, who had defended Mrs. Fritz at the original hearing. It charged that the decision was beyond the statutory and regulatory authority of the PAB. The PAB denied the motion. Mrs. Fritz subsequently discussed the matter with the Governor; she testified that her conclusion from this conversation was "that this was a Board that was there to assist me to do my job and this was the decision they made and I should support them." She then hired Penei Sewell as Executive Director and terminated the employment of Mrs. Banks.

Mrs. Banks attempted to appeal the decision of the Personnel Advisory Board to the Appellate Division of the High Court. The Appellate Division has jurisdiction to hear an appeal of an administrative agency decision from any "person who has exhausted all administrative remedies within an agency and who is aggrieved by a final decision in a contested case." A.S.C.A. 8 4.1040. A special session of the Appellate Division held, however, that Mrs. Banks was not a party to the PAB procedure and that she therefore had no standing to appeal the decision. Banks v. A.S.G., 2 A.S.R.2d

117

88 (1985). She subsequently filed this action in the Trial Division of the High Court.[1]

The plaintiff alleges that her termination violated numerous statutes, regulations, and constitutional provisions. Her claims are of three varieties:

(1) ASG violated its own personnel statutes, thus denying plaintiff the due process of law;

(2) ASG discriminated against plaintiff because of her race, color, sex, and/or national origin; and

(3) the Office of the Attorney General of ASG violated plaintiff's rights by giving her the impression that her interests were being represented in the PAB hearing and that she need not retain her own attorney, and by subsequently defending the PAB in her appeal from its decision.

## II. Due Process and Employment Procedures

The Court agrees with plaintiff's position, which was also the position of the Office of the Attorney General in its motion for reconsideration of the Personnel Advisory Board decision, that the PAB had no authority to order her termination or the employment of Mr. Sewell. Although A.S.C.A. § 7.0102, which establishes the PAB, provides that it shall perform such duties as are from time to time assigned to it by the Governor, there is no evidence that it was ever assigned the power to hire and fire. Indeed, any such assignment would seem to violate A.S.C.A. § 7.0206, which prescribes a hiring procedure in which the sole participants are the Director of Manpower Resources and the head of the department in which the vacancy exists, and A.S.C.A. § 7.0211, which prescribes the termination

---

[1]. Mrs. Banks subsequently accepted temporary employment with ASG, at the same salary she had made as executive director of the DDPC. Her job was to monitor federal programs, including the Disabilities Developmental Planning program, for the Office of Manpower Resources. This employment continued until sometime in the spring of 1986. In June of 1986 Mr. and Mrs. Banks returned to the United States.

procedure for ASG employees during the initial one-year probationary period.

The evidence clearly establishes, however, that the plaintiff was fired not by the PAB but by the Director of Manpower Resources, acting on what she regarded as the suggestion of the Governor. According to her testimony, she terminated the plaintiff's employment not because she shared the PAB's misunderstanding of the nature of its own powers, but because her own immediate superior, the Governor, was satisfied with the PAB's recommendation and believed it should be carried out. The plaintiff argues that this reason is insufficient to satisfy the statutory requirement for termination: that the probationary employee's retention is not "in the best interests of the government." A.S.C.A. § 7.0211. On the contrary, we believe that this language was designed to give the executive the broadest possible discretion in terminating probationary employees. The Personnel Advisory Board believed that it was in the best interest of the government to terminate Mrs. Banks not because she was incompetent but because of the process by which she had been hired. The Governor concurred, either because he agreed with the recommendation or because he thought it in the best interest of the government to uphold the judgment of his advisors on this matter. It is not the function of a court to substitute its judgment for that of the executive branch on what is in "the best interest of the government."

There was also substantial compliance with the procedural requirements of the probationary employee termination statute. The PAB, the agency charged by law with "investigating and deciding recommendations for dismissal," made such a recommendation and put it in writing. Although A.S.C.A. § 7.0211 requires that such recommendations be made by "department heads or other authorized operating officials," the decision of the PAB satisfied this requirement inasmuch as the plaintiff was herself the top-ranking senior employee of the DDPC and the members of the PAB were in fact the officials whose reasons plaintiff needed to know in order to pursue any remedies she might have. Section 7.0211 further requires that the director of manpower resources tell the employee in writing of the date of termination, the reasons for termination, and that he has no right to a hearing. This was done.

The Due Process Clauses of the United States Constitution and of the American Samoa Constitution add nothing to the plaintiff's statutory rights. A government employee who has no contractual or statutory right to continued employment may be fired for any reason, or even "for no reason whatever," without a denial of due process. Mount Healthy City Board of Education v. Doyle, 429 U.S. 274, 283 (1976); see Board of Regents v. Roth, 408 U.S. 564 (1972). The only exception is that the employee cannot be fired for a reason that itself constitutes a violation of some constitutional right, such as free speech or equal protection of the laws. Mount Healthy City Board of Education v. Doyle, supra; Pickering v. Board of Education, 391 U.S. 563 (1968). We turn, therefore, to plaintiff's claim that she was fired because of her race or sex.

## III. Discrimination[2]

### A) Sex Discrimination

There is no evidence that Mrs. Banks was discriminated against because of her sex. There was certainly no overt discrimination, and the only conceivable evidence of "sexual stereotyping" was the concern of the PAB that Mrs. Banks might leave the Territory at the conclusion of her husband's employment contract. This concern, however, was not shown to have been based on generalizations about women. It could just as easily have been based on the Territory's experience with the spouses of off-island contract employees, both male

---

[2]. We address the claims of discrimination by sex and by race. The plaintiff's husband also seemed to suggest in his testimony that his wife should have received special consideration because she is handicapped. This appears to have been an afterthought. The handicap in question, a back injury, was apparently unknown to the PAB when it made its decision. This would not relieve ASG of any affirmative duties it might have to make the handicapped aware of available positions; in this case, however, the plaintiff already knew about the position, and she and her husband knew more than anyone else involved in the process about any special consideration she should have been given. In any case, the plaintiff waived any such defect in the process by not including it in her complaint.

120

and female, or on the fact that Mrs. Banks herself had recently left a job in her chosen field to move with her husband to American Samoa.

### B) Racial Discrimination

Plaintiff's principal contention is that she was terminated because of her race. Much of the evidence adduced at trial had to do with the "American Samoan preference" in government employment. This preference is required by A.S.C.A. § 7.0205(b), which provides that

> Any person entering the career service shall be a resident of American Samoa and either an American Samoan or an American national at the time he enters the service. If no resident can be found who meets the minimum qualifications for employment established for a particular class of work, nonresidents may be employed.

Plaintiff argues that this is a racial classification which denies the right to equal protection of the laws guaranteed to her by the United States Constitution and by the federal civil rights laws.

The record clearly shows, however, that the plaintiff was not fired because of her race. Her termination was recommended by the PAB because it believed that her husband had manipulated the hiring process to get her the job.

Moreover, the evidence is overwhelming that Mr. Banks actually did manipulate the process from beginning to end. In his first conversation about the job with Mrs. Fritz, he suggested that the DDPC be placed under the Office of Manpower Resources rather than within his own department; although this might be taken as evidence of an unusually magnanimous attitude with regard to bureaucratic turf, the context suggests that it was an effort to evade the territorial regulation that forbids the immediate supervision of one family member by another. See American Samoa Administrative Code (A.S.A.C.) § 4.0301(5). Mrs. Fritz testified that she felt substantial pressure from Mr. Banks to find a job for Mrs. Banks in the area of vocational rehabilitation. And it is quite clear that without the intervention of Mr. Banks, Penei Sewell would have been hired at the conclusion of the first interview process. Mr. Banks's repeated

121

interventions in the process, the timing of his resignation as DDPC chairman, and the evidence that he continued to be the dominant influence on the DDPC during the period in which Mrs. Banks was finally hired, all support the conclusion of the PAB that the hiring of Mrs. Banks "made a mockery of career service procedures."[3]

It is also clear that the "American Samoan preference" was never applied against the plaintiff. The evidence suggests that the preference was in common use until a few months before she was hired and was put back into use a few months after her termination, but was not being used at any time relevant to this case. This was apparently because ASG officials were under the impression that it had been overridden by a change in the immigration laws. Whatever the reasons, the plaintiff's application was approved by OMR and sent on for further consideration although OMR believed that there were qualified American Samoan candidates. Mrs. Banks was hired, although she was in competition with several Samoans. And when the PAB recommended her termination, it specifically rejected the part of Mr. Sewell's claim that was based on his Samoan ancestry.

Plaintiff argues, however, that even if the American Samoan preference was not technically enforced in this instance, it is evidence of a pattern or practice of discrimination by ASG against non-Samoans and is therefore relevant to show that ASG officials acted with discriminatory

[3]. There is nothing wrong, of course, with believing one's spouse to be the best candidate for a job. In this case, depending on whether technical expertise and training are deemed more important than familiarity with the community for which programs are being planned, Mrs. Banks may well have been the best candidate. The PAB obviously felt, however, that Mr. Banks had a conflict of interest and should have been far less active in the hiring process. The generalized process concerns, apparently unrelated to his wife's ambitions, that Mr. Banks cited as the basis for his opposition to the initial recommendation, and his testimony in court that he really did not want her to get the job, serve only to add a whiff of deviousness to his mishandling of the situation.

intent. Plaintiff urges that such intent is also shown by the PAB's conclusion that Mr. Sewell had been deprived of his "right as an American Samoan to be employed." There was also testimony that at the PAB hearing someone (either board members, witnesses, or counsel) used the term "papalagi," which may be regarded as a racial epithet for Caucasians. Finally, the concerns cited by the ASG officials who opposed the hiring of plaintiff--- that she was unfamiliar with the community, did not speak Samoan, and was likely to leave the Territory in a year or two --- could be regarded as code words for racism.

The Court is unpersuaded that this evidence shows discriminatory intent. What it does is to illustrate the difficulties that arise in any analysis of racial questions that attempts to deal with Samoa as if it were Alabama or Michigan. It is true that some Samoans use the term "papalagi" with hostility or disdain, just as some papalagi use the word "Samoan." But residents of Samoa who are not racists use these words as everyday descriptive terms: they are the only ones we have. Similarly, the substance of the PAB opinion supports the contention of the PAB chairman that his infelicitous reference to Mr. Sewell's rights "as an American Samoan" had no racial connotation. He had just got through denouncing what he regarded as a pattern of chicanery and favoritism, and he was invoking more or less what people invoke when they refer to "the rights of Americans" or "my rights as a citizen of a free country."

It is also true that bilingualism and familiarity with Samoa could be pretexts for racial discrimination, but they could just as easily (far more easily than in the continental United States) be bona fide occupational qualifications. These concerns, and the related concern that American Samoa become as fully self-governing as is consistent with local conditions and with the continued strength of the relationship between the Territory and the United States, gave rise to the American Samoan preference in government employment.

If American Samoa were an integral part of the United States, the constitutionality of the Samoan preference would depend on whether these concerns would qualify as "compelling state interests" sufficient to justify what would otherwise be an abridgement of the right to be free from racial

123

discrimination.[4] The courts have long employed a different standard, however, for applying the United States Constitution in the territories. Until the end of the Nineteenth Century all territories of the United States were intended for integration and assimilation with the rest of the country. At about the time of the Spanish-American War, however, the United States acquired a number of territories about which there was no such intention, and whose cultures and legal systems differed markedly from the Anglo-American. In The Insular Cases the United States Supreme Court held that in such "unincorporated" territories the

---

[4]. ASG suggests, for instance, that the American Samoan preference can be justified as an affirmative action program designed to eliminate the effects of past discrimination. (Indeed, the administrative regulations designed to enforce the American Samoan preference are styled an "Equal Opportunity Affirmative Action Plan." See Appendix A to A.S.A.C. § 4.1108.) Although we reach much the same conclusion in our discussion of The Insular Cases, in the absence of these cases the constitutionality of the Samoan preference as an affirmative action plan would be problematic. The nature of the preference--- no non-Samoan can be considered until all qualified American Samoans have been employed --- is quite similar to that declared unconstitutional by the Supreme Court in Regents of the University of California v. Bakke, 438 U.S. 254 (1978). Moreover, unlike most affirmative action plans, the Samoan preference is currently administered by and for the group that constitutes the overwhelming majority within the Territory and that wields political power. Such a plan might present different constitutional problems than one in which the representatives of the majority group, in an effort to redress past discrimination by members of their own group, discriminate in favor of a relatively powerless minority. Finally, the absence of systematic efforts to employ members of non-Samoan groups that are both underrepresented and historically disadvantaged, such as Orientals and Tongans, suggests that the American Samoan preference is better defended as an American Samoan preference than as an affirmative action plan.

124

Constitution applied only insofar as its tenets restate "those fundamental limitations in favor of personal rights" that are "the basis of all free government." Dorr v. United States, 195 U.S. 138, 146 (1922); see also Balzac v. Porto Rico, 258 U.S. 298 (1922); Hawaii v. Mankichi, 190 U.S. 197 (1903); Downes v. Bidwell, 182 U.S. 244 (1901). Rights which are regarded as fundamental in the Anglo-American tradition but not in other free and civilized societies do not apply in an unincorporated territory, at least when they would tend to be destructive of the traditional culture.[5]

Although the doctrine of The Insular Cases has been criticized, it has never been repudiated by the Supreme Court and has often been reaffirmed by the lower federal courts. Most recently, the United States Court of Appeals for the Ninth Circuit (which has jurisdiction over all Pacific territories but American Samoa, and which has jurisdiction over American Samoa in connection with a few statutes unrelated to this case) applied the doctrine of The Insular Cases to determine that an unincorporated territory need not provide jury trials in all felony cases. Commonwealth of the

---

[5]. The doctrine of The Insular Cases was a middle ground between the view that all provisions of the Constitution applied of their own force in every territory, and the radically opposing view that Congress was free to extend or not to extend each provision into each territory as it saw fit. The Supreme Court has held that a constitutional provision which does not apply in a territory of its own force may nevertheless be extended to that territory by Congress. See Torres v. Commonwealth of Puerto Rico, 442 U.S. 465 (1979), where the Court held that in approving a constitution for Puerto Rico which contained a prohibition against warrantless searches, Congress implicitly extended into Puerto Rico the similar provisions of the Fourth Amendment. In the present case it is instructive that the Revised Constitution of American Samoa --- which was promulgated by the Secretary of the Interior under a delegation of authority from Congress and which arguably has been ratified by a recent Act of Congress forbidding the Secretary from changing its provisions --- contains no equal protection clause.

125

_Northern Mariana Islands v. Atalig_, 723 F.2d 682 (9th Cir. 1984). The District of Columbia Circuit, which has also asserted jurisdiction over American Samoa, reached a different conclusion but also reaffirmed the basic doctrine of _The Insular Cases_. _King v. Morton_, 520 F.2d 1140 (1975) (holding that jury trial is required in American Samoa if and only if it is consistent with the Samoan culture).

The Fourteenth Amendment, which prohibits most forms of racial discrimination, applies on its face to the states rather than to the territories or to the federal government. The Supreme Court has held, however, that the Due Process Clause of the Fifth Amendment implicitly forbids racial discrimination by the federal government. _Bolling v. Sharpe_, 347 U.S. 497 (1954). Although it is clear that the Due Process Clause is binding on the territories in at least some of its applications, this does not mean that it is binding in the same ways and to the same extent as in the continental United States. _See Commonwealth of the Northern Mariana Islands_, _supra_, 723 F.2d at 689. Rather, it depends on whether the particular application in question is fundamental to "the basis of all free government," and on the burdens it would impose on the culture of the territory. _See id._

Although some forms of racial discrimination surely transgress the limits of what most of us today would regard as a free and civilized society, it would be difficult to sustain the proposition that any society that uses a racial classification for any purpose is necessarily to be regarded as uncivilized or unfree. Particularly in the extension of political rights, many nations (including, for instance, Western Samoa, Fiji, Japan, Israel, and Ireland) discriminate in ways that would be forbidden in the United States. Indeed, although judges and scholars in the United States have frequently asserted that the racial quotas, goals, and timetables contained in some affirmative action plans do not constitute racial discrimination, it seems more accurate to say that such "reverse" discrimination has been deemed necessary to avoid or eliminate even worse evils.

Against this background, we cannot hold that when the chiefs of Tutuila and Manu'a ceded their territory to the United States every American automatically acquired an equal right with Samoans to participate in the administration of the American Samoa Government. On the contrary, American Samoa has remained an unincorporated

126

territory precisely because it was the intention of the United States to hold it in trust for American Samoans. That such an enterprise was not inconsistent with the United States Constitution was the major premise of the Treaties of Cession and the central holding of The Insular Cases.[6] Even if the Samoan preference had been applied against Mrs. Banks, therefore, we would reject her claim.

This is not to say that the Territory has carte blanche to practice any form of racial discrimination. Indeed, some statutes currently on the books --- which seem to discriminate against "half-castes" who were born and raised here and who might be thoroughgoing Samoans in every respect but that they lack a certain percentage of Samoan blood

---

[6]. Cf. Morton v. Mancari, 417 U.S. 535 (1974), upholding the constitutionality of an "Indian preference" statute for employment in the Bureau of Indian Affairs, which is charged with administration of Indian reservations and related programs.

> The purpose of these preferences, as variously expressed in the legislative history, has been to give Indians a greater participation in their own self-government, to further the Government's trust obligation toward the Indian tribes, and to reduce the negative effect of having non-Indians administer matters that affect tribal life.

Id. at 541-42 (footnotes omitted). The Indian preference, like the American Samoan preference, "is granted to Indians, not as a discrete racial group, but, rather, as members of quasi-sovereign tribal entities whose lives are governed by the BIA in a unique fashion." Id. at 554. The Court characterized it as "political rather than racial in nature." Id. at 553 n.24. The constitutional justification for this special political arrangement was found in the fact that the United States, by acquiring control over the Indians in the exercise of the war and treaty powers, had thereby undertaken a trust obligation to them. Id. at 552. Implicit in this trust obligation was the power, and perhaps the duty, to employ Indians wherever possible in positions related to their own governance.

--- present a much more difficult question than the employment preference. Strictly speaking, the American Samoan preference is not a racial classification at all: both on its face and as applied, it excludes Western Samoans who are ethnically identical to American Samoans and it includes non-Samoans who have resided here for more than twenty years. See A.S.C.A. § 7.0205(b); A.S.A.C. § 4.0301(3); Appendix A to A.S.A.C. § 4.0118.

Although the preference has an obvious racial effect in that it is more difficult for an ethnic non-Samoan to secure its benefits than for an ethnic Samoan, its principal purpose and effect are to ensure self-government. Twenty years ago there were practically no Samoans in responsible government positions. Non-Samoans still occupy such positions in vast disproportion to their numbers in the general population. Almost all of these government officials have recently arrived in the Territory and will leave within a few years. Almost none speak the Samoan language, which is still the primary language of almost all Samoans. One need not be a racist (or a Samoan) to recognize the serious disadvantages of this situation. The American Samoan preference law, which is essentially a preference for permanent residents rather than for ethnic Samoans, is reasonably calculated to alleviate it. It is not unconstitutional.[7]

---

7. Although plaintiff does not rely on the Privileges and Immunities Clause, art. IV, § 2, we note that if a state were to discriminate in favor of its own long-time residents, it might well violate this provision. Because this clause applies on its face only to states, and for the other reasons cited in our discussion of the Due Process Clause, we do not believe that it makes the American Samoan preference unconstitutional.

In addition to her constitutional claims, plaintiff argues that the Samoan preference violates the federal civil rights laws, particularly 42 U.S.C. § 1983. This section is essentially remedial; it creates a cause of action for violations of rights secured by the Constitution and laws of the United States. Although it applies on its face to violations committed under color of territorial (as well as state) law, it cannot be taken as a decision by Congress to extend every

## IV. The Conduct of the Attorney General's Office

The plaintiff argues that her rights were further prejudiced when she was lulled into a belief that the Assistant Attorney General who represented the Office of Manpower Resources before the PAB was also "her" lawyer. At some point during the PAB proceedings it appears that plaintiff asked the Assistant Attorney General whether she should retain her own lawyer and was told that this would do her no good, since (1) the grievance was frivolous and (2) the proceeding was between Sewell and the government.

After the PAB's initial decision, the same Assistant Attorney General filed a motion for reconsideration arguing that the PAB had no authority to order the hiring of Mr. Sewell. After the motion was denied and the Director of OMR decided to hire Mr. Sewell, a different Assistant Attorney General defended the PAB in Mrs. Banks's attempted appeal. He contended, as the Office of the Attorney General had contended all along, that the PAB had not fired Mrs. Banks. He argued instead that she had been fired by the Director of

---

application of every constitutional provision into every territory. Such a construction would be radically inconsistent with The Insular Cases, which were decided some years after the language of § 1983 was first enacted and which held that some constitutional provisions remained inapplicable in unincorporated territories. On the contrary, a decision by Congress to leave a territory unincorporated is an implicit decision not to extend into that territory those applications of the Constitution that are not part of the "basis of all free government" and that would be inappropriate to local conditions. See Commonwealth of the Northern Marianas, supra, 723 F.2d at 688-90. In the absence of specific evidence to the contrary, therefore, a judicial determination that a particular application of the Constitution does not apply in a territory will dispose of arguments that a parallel federal statute does apply and achieves the same result. Even if the Samoan preference had been applied against plaintiff, therefore, we would reject her statutory as well as her constitutional claims.

129

OMR, who did have the authority to do so.

In retrospect, it might have been better for the Assistant Attorney General in the PAB proceeding to refuse to advise Mrs. Banks one way or the other on whether to retain a lawyer. Instead, she gave her honest opinion in response to an inquiry from someone with whom she had been working closely. There was no evidence, however, that she gave Mrs. Banks any reason to believe that the Office of the Attorney General was looking out for Mrs. Banks's interests and would continue to do so no matter what.

In any case, there is no evidence that Mrs. Banks was damaged by her failure to retain a lawyer. Even if the PAB had been persuaded to admit her as a "party" to its grievance procedure, the most she might have obtained was a decision on the merits from the Appellate Division of the High Court. Even if she had been a "party," it is quite possible that the Appellate Division would have rejected her appeal on the ground that she had ultimately been fired by the Director of Manpower Resources. And if the Appellate Division had reviewed her claim on the merits, the scope of judicial review would have been narrower than the review she subsequently sought and obtained in this proceeding. See A.S.C.A. §§ 4.1043-44.

We have held that her rights were not violated. She has the right to appeal our decision to the Appellate Division. If the Appellate Division disagrees with us and finds that the termination violated plaintiff's rights, it can provide a remedy. If the Appellate Division finds that the termination did not violate plaintiff's rights, then there is no reason to assume that the Appellate Division would have decided differently in 1985. In either case, the plaintiff will not have been damaged by her failure to be recognized as a party to the 1985 appeal.

Moreover, the causal connection between the Assistant Attorney General's response to plaintiff's inquiry about whether she should obtain a lawyer and the Appellate Division's holding that she had no standing to appeal is far too attenuated and speculative to justify an award of damages even if there were any.

V.  ORDER

Accordingly, the action is dismissed.