**A & E PACIFIC CONSTRUCTION COMPANY; American International Knitters Corporation; American Investment Corporation; Basic Construction Company and Supply; Bell Homes, Inc.; Black Microl Corporation, et al., Plaintiffs–Appellants,**

v.

**SAIPAN STEVEDORE COMPANY, INC.; Carlos Shoda; Commonwealth Ports Authority, Northern Mariana Islands; Edward Villagomez; George Fleming; Roman Palacios, J.M. Guerrero; Nick Sablan; Rafaela Perry; Vicente Calvo, in their individual and representative capacities, Defendants–Appellees.**

No. 88–15021.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 6, 1989.

Decided Oct. 19, 1989.

Robert O'Connor, O'Connor and Sorensen, Saipan, MP, for plaintiffs-appellants.

Gary G. Grimmer, Carlsmith, Wichman, Case, Mukai & Ichiki, Honolulu, Hawaii, for defendants-appellees.

Before TANG, CANBY and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

In this case of first impression we are called upon to determine whether the Shipping Act of 1984 applies to the Common-

wealth of the Northern Mariana Islands, and whether the Federal Maritime Commission has original and exclusive jurisdiction over the instant dispute. The district court answered both questions in the affirmative and denied the appellants' requested relief. We affirm.

## I

The Commonwealth Ports Authority ("CPA") is a public corporation organized under the laws of the Commonwealth of the Northern Mariana Islands ("CNMI"). The CPA owns, and is otherwise responsible for the development and operation of, *inter alia*, the Commercial Port of Saipan ("Port"). Among the powers granted to the CPA is that of leasing the Port's harbor facilities, known as "Charlie Dock," for periods of up to forty years.

Saipan Stevedore Company, Inc. ("SSC") has been the exclusive operator of Charlie Dock since 1966 pursuant to a series of leases between SSC and the CPA or its predecessors. The most recent of these exclusive leases, dated August 27, 1985, is for a period of fifteen years, renewable for a like period at SSC's option. SSC sent a copy of this lease to the Federal Maritime Commission ("FMC") in Washington, D.C. on September 4, 1985 for filing but, due to some procedural missteps, the lease was not accepted and deemed effective by the FMC until July 18, 1987.

On November 12, 1987, SSC published a proposed tariff increase. SSC notified the FMC of the expected rate hike by letter of the same date, receipt of which was acknowledged by the FMC the following week. The new tariffs went into effect on December 15, 1987.

On December 28, 1987, counsel for a group of local businesses and businessmen who were unhappy with the tariff increase wrote the FMC, asking it to block the higher rates and review the new lease of Charlie Dock to SSC. Three weeks later this group of businesses and businessmen (collectively, "appellants") brought suit against SSC, the CPA, and various individuals involved with the new lease of Charlie Dock. The appellants' complaint set forth seven claims for relief: three under federal law (Sherman Antitrust Act, Counts I and V; Civil Rights Act, Count IV) and four under the common law or CNMI law (Counts II, III, VI, and VII). Jurisdiction was predicated on the existence of a federal question with pendent claims, and the remedies sought included treble damages as well as declaratory and injunctive relief.

On February 17, 1988, SSC filed an alternative motion, subsequently joined in by the other appellees, to dismiss, to grant summary judgment, or to stay the action. Following a hearing with oral argument, the district court dismissed Counts II through VII of the appellants' complaint and denied their request for an injunction. The gist of the court's holding was that, because the Shipping Act of 1984 ("Act"), codified at 46 U.S.C.App. §§ 1701–20, applied to the CNMI and vested regulatory oversight of harbor leases exclusively with the FMC, the district court was without jurisdiction to entertain Counts II through VII of the appellants' complaint. The appellants then moved the district court to certify its decision and order as a final judgment pursuant to Fed.R.Civ.P. 54(b). Their motion was granted, and the appellants timely appealed.

## II

■ The first question we must address is whether the Act applies in the CNMI. The district court concluded that it did, and we review *de novo* all such determinations. *Cf. Merritt v. County of Los Angeles*, 875 F.2d 765, 768 (9th Cir.1989) (interplay of state statute of limitations with federal civil rights statute question of law reviewed *de novo*).

■ The Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America ("Covenant"), Pub.L. No. 94–241, 90 Stat. 263 (1976), *reprinted in* 48 U.S.C.A. § 1681 note (1987), declares in relevant part that "those provisions of the Constitution, treaties and laws of the United States applicable to the Northern Mariana Islands, will be the supreme law of the

Northern Mariana Islands."[1] Covenant § 102. Section 105 of the Covenant qualifies this language somewhat by requiring that Congress not exercise its legislative authority in such a way as to violate the "fundamental provisions" of the Covenant respecting the CNMI's "right of self-government," and specifically mentions Articles I, II and III and Sections 501 and 805 of the Covenant as provisions which "may be modified only with the consent of the Government of the United States and the Government of the Northern Mariana Islands." Because the Act is expressly made applicable not only to the CNMI but to the several States as well, *see* 46 U.S.C.App. § 1702(27),[2] and nothing in the Act is violative of the provisions of Section 105 of the Covenant,[3] the Act constitutes part of the supreme law of the CNMI and necessarily overrides any inconsistent local law.[4] Covenant §§ 102, 105. Accordingly, and for the same reason, the appellants' argument that the Act does not apply in the CNMI because the CNMI did not expressly consent to it is wholly without merit.

■ Among other things, the Act exempts from federal antitrust laws those agreements and activities which are subject to the regulatory oversight of the FMC. 46 U.S.C.App. § 1706(a); H.R.Rep. No. 53, Part I, 98th Cong., 2d Sess. 3, *reprinted in* 1984 U.S.Code Cong. & Admin.News 167, 168. Specifically, the Act bars private antitrust lawsuits, providing instead for an administrative complaint and review process before the FMC, which has exclusive jurisdiction over all such matters. *Seawinds*

*Ltd. v. Nedlloyd Lines, B.V.*, 80 B.R. 181, 183–84 (N.D.Cal.1987), *aff'd*, 846 F.2d 586 (9th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 226, 102 L.Ed.2d 216 (1988); H.R.Rep. No. 53, Part I at 12, 1984 U.S.Code Cong. & Admin.News at 177. Thus, while no private party may sue for damages or for injunctive relief under the antitrust laws for conduct falling within the purview of the Act, *see* 46 U.S.C.App. § 1706(c)(2), the FMC is empowered to order reparations, including double damages, to impose sanctions and penalties for prohibited conduct, and to file suit in federal district court against the offending party. *See, e.g.*, 46 U.S.C.App. §§ 1705(g) and (h), 1710; *Seawinds*, 80 B.R. at 184.

### III

■ Since it is clear that the Act not only applies in, but is part of the supreme law of the CNMI, we now turn to the question whether the lease entered into between SSC and the CPA falls within the ambit of the Act.

Section 1703(b) of the Act states, in relevant part:

> This chapter applies to agreements ... among marine terminal operators ... to (1) discuss, fix, or regulate rates ... and (2) engage in exclusive ... working arrangements.

While the appellants concede that SSC is a marine terminal operator, they contend that the CPA is not. This position lacks merit.

---

1. For a good overview of the political relationship between the United States and the CNMI, *see CNMI v. Atalig*, 723 F.2d 682, 684–86 (9th Cir.), *cert. denied*, 467 U.S. 1244, 104 S.Ct. 3518, 82 L.Ed.2d 826 (1984).

2. "As used in this chapter 'United States' includes the several States, the District of Columbia, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Marianas, and all other United States territories and possessions."

3. Contrary to the contention of appellants, nothing in the Act interferes with CNMI's right of self-government, or modifies Articles I, II, III, or sections 501 or 805 of the Covenant. Indeed, it is appellants who seek to interfere with an act

of self-government—the decision of CPA to grant an exclusive, long-term lease of Charlie Dock to SSC.

4. The *Section by Section Analysis* from the Senate Committee on Interior and Insular Affairs Report on the Covenant to Establish a Commonwealth of the Northern Mariana Islands (1975), which this court has declared to be "authoritative," *see Fleming v. Department of Public Safety*, 837 F.2d 401, 408 (9th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 222, 102 L.Ed.2d 212 (1988), states that "[f]ederal law will control in the case of a conflict between local law (even a state's constitution) and a valid federal law." S.Rep. No. 94–433, 94th Cong., 1st Sess. 65, 66 (1975), U.S.Code Cong. & Admin.News 1976, p. 448.

"Marine terminal operator" is defined under the Act as

[A] person engaged in the United States [5] in the business of furnishing wharfage, dock, warehouse, or other terminal facilities in connection with a common carrier.

46 U.S.C.App. § 1702(15).

In *Plaquemines Port, Harbor & Terminal Dist. v. Federal Maritime Comm'n,* 838 F.2d 536, 540 (D.C.Cir.1988), the District of Columbia Circuit construed "marine terminal operator" under the 1984 Act as applicable to a municipal port which did not even own or operate wharves, docks, or other waterside facilities, because the port provided, *inter alia,* such collateral services as police and fire protection. *Id.* at 543. Here, the CPA owns and is responsible for Charlie Dock, and charges wharfage fees for SSC's use of those facilities. In light of the above authorities, we agree with the District of Columbia Circuit's reasoning in *Plaquemines* and hold that the CPA is a marine terminal operator within the meaning and intent of the Act. Because the CPA entered into an agreement with another marine terminal operator that allowed for the fixing of rates in an exclusive working arrangement, it necessarily follows that the CPA, SSC, and their lease of Charlie Dock fall under the exclusive jurisdiction of the FMC pursuant to the terms of the 1984 Act.[6]

AFFIRMED.

---

**5.** Defined to include the CNMI. *See* 46 U.S.C. App. § 1702(27).

**6.** The appellants have also raised such arguments as that the lease was void *ab initio* and the parties thereto are not immune from the antitrust laws. The FMC deemed the lease to be effective as of July 18, 1987, and the antitrust laws do not reach such agreements. *See* 46 U.S.C.App. § 1706(a)(1). Moreover, all activity permitted *or prohibited* by the Act enjoys immunity from antitrust coverage if undertaken with a reasonable belief that it was being done under an effective agreement filed with the FMC, at least until such immunity is set aside by an agency or court. *See* 46 U.S.C.App. § 1706(a)(2), (c)(1). The appellants have submitted nothing to show the unreasonableness of the appellees' beliefs on this point.

A collateral issue is whether the appellants' pendent common law claims may nevertheless be saved by the presence of Count IV of their complaint, which alleged not a violation of the antitrust laws but of 42 U.S.C. § 1983. A careful reading of that Count shows it to be nothing more than a disguised antitrust claim, both in the nature of the conduct complained of and the relief sought. We therefore agree with the district court's holding and decline to address the merits of that claim.