**Concepcion S. WABOL, et al.,
Plaintiffs–Appellees,**

**v.**

**Victorino VILLACRUSIS, et al.,
Defendants–Appellants.**

**No. 87–1736.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 11, 1988.

Decided Feb. 20, 1990.

As Amended July 9, 1990.

Marybeth Herald, Fitzgerald, Herald & Bergsma, Saipan, Com. of the Northern Mariana Islands, for defendants-appellants.

Theodore R. Mitchell, Saipan, Com. of the Northern Mariana Islands, Charles K. Novo–Gradac, White, Novo–Gradac and Thompson, Saipan, Com. of the Northern Mariana Islands, for plaintiffs-appellees.

Before POOLE, WIGGINS and BRUNETTI, Circuit Judges.

### ORDER

The court has ordered the opinion filed February 20, 1990 [898 F.2d 1381 (9th Cir. 1990)] to be amended as follows:

1. At slip op. page 1819 four lines from the bottom [898 F.2d at 1386, 2d col., line 24], add after the cite the following parenthetical:

(holding that no full faith and credit is warranted for decision rendered by court without jurisdiction);

2. At slip op. page 1821, first line [898 F.2d at 1387, 1st col., line 16], replace the first full sentence with the following: This court has jurisdiction over all appeals from the appellate division pursuant to section 403(b) of the Covenant,

originally codified at 48 U.S.C. § 1694c(b), which provides that those sections of Title 28 of the U.S. Code applicable to Guam shall be applied to NMI. 28 U.S.C. § 1291 provides for Ninth Circuit jurisdiction over all appeals from the appellate division of the district court of Guam. Congress explicitly clarified section 403(b) by amending the implementing legislation in 1984 to provide that this court "shall have jurisdiction of appeals from all final decisions of the appellate division of the district court" of NMI. 48 U.S.C. § 1694b(c).

3(a). At slip op. page 1822, after the first sentence of the first full paragraph [898 F.2d at 1387, 2d col., line 20], insert:

Although section 402 clearly authorizes the NMI to bestow or withdraw appellate jurisdiction on or from the district court in cases originating in the local trial courts, nothing in that section or elsewhere in the Covenant authorizes the NMI to define or limit the jurisdiction of this court or the U.S. Supreme Court. Despite appellees' assertion that "[w]hen the root is cut, the branches fall", *Smallwood v. Gallardo*, 275 U.S. 56, 62, 48 S.Ct. 23, 24, 72 L.Ed. 152 (1927), authority over the appellate jurisdiction of the district court does not imply authority over this court. The cases relied on by appellees support only the principle that, once jurisdiction is withdrawn from a lower court, a *subsequent* appeal to a higher court will not save it from that withdrawal. Here, however, the appeal was pending in this court when the Act was passed, and had been properly taken from the appellate division before that court was divested of jurisdiction.

3(b). At slip op. page 1822 [898 F.2d at 1387, 2d col., line 20], delete the words "When Congress amended the Covenant in 1984, * * *" and substitute the following:

Furthermore, when Congress amended the implementing legislation in 1984 to clarify this court's misinterpretation of section 402(c) of the Covenant in *Sablan v. Santos*, [634 F.2d 1153 (9th Cir.1980)]

and continue from the words "it made clear its original intent * * *" to the end of the paragraph.

4. At slip op. page 1822, footnote 12 [898 F.2d at 1388], add to the end of the footnote the following:

*Atalig* does not provide support for NMI's attempt to define and limit this court's jurisdiction. This court held in *Atalig* that, *because* section 403(b) of the Covenant, implemented at § 1694b(c), bestowed jurisdiction on this court over appeals from the appellate division of the district court, NMI could authorize its government to appeal from criminal cases in the appellate division. Thus, this court relied solely on the jurisdiction granted to it under the Covenant, and has never authorized NMI to unilaterally define its jurisdiction.

POOLE, Circuit Judge:

In *Commonwealth of Northern Mariana Islands v. Atalig*, 723 F.2d 682 (9th Cir.), *cert. denied*, 467 U.S. 1244, 104 S.Ct. 3518, 82 L.Ed.2d 826 (1984), we held that the Sixth Amendment right to a trial by jury does not apply in the Commonwealth of the Northern Mariana Islands (NMI or Commonwealth). This case requires us to determine whether the constitutional guarantee of equal protection of the laws limits the ability of the United States and the Commonwealth to impose race-based restrictions on the acquisition of permanent and long-term interests in Commonwealth land. Plaintiffs-appellees Concepcion S. and Elias S. Wabol (collectively Wabol) brought this action in the Commonwealth Trial Court to void their lease agreement with defendants-appellants Victorino Villacrusis and Philippine Goods, Inc. (collectively PGI). Wabol alleged the agreement violated Article XII of the NMI Constitution which provides that the sale of a freehold or a leasehold exceeding forty years, including renewal rights, to a person not of Northern Mariana Islands descent, is void ab initio. PGI defended on the ground that Article XII violates the equal protection clause of the United States Constitution. The trial court upheld the restriction but reformed the lease on equitable grounds. The Appellate Division of the District Court for the Northern Mariana Islands reversed, also upholding the restriction, but concluding that section 6 of Article XII precludes reformation of a prohibited lease. The district court remanded to the trial court "to determine the terms and conditions of any obligations which may have arisen in quasi contract or as a result of a periodic tenancy" and to account for the improvements erected on the land by PGI. PGI timely appealed.

We conclude that, despite the remand, we have jurisdiction to consider this appeal. In addition, we conclude that the Commonwealth Judicial Reorganization Act of 1989, NMI Public Law No. 6–25, enacted while this appeal was pending, does not divest this court of jurisdiction to decide the appeal. On the merits, we hold that the right to acquire permanent or long-term interests in NMI real estate is not one protected by the United States Constitution. We further hold that Article XII precludes reformation of a lease which violates its provisions. Accordingly, we affirm the judgment of the district court.

## I. BACKGROUND

### A. Facts

In 1978, defendant Filomenia Wabol Muna and PGI entered into an agreement, approved by Wabol, to lease a parcel of NMI property for a 30 year term with an unconditional option in lessee PGI to renew for 20 additional years. Thereafter Wabol obtained full ownership of the premises in a partition action. Muna, however, continued to collect rents, and Wabol brought this suit seeking, *inter alia*, a judgment voiding the lease for violation of Article XII.

### B. Article XII of the NMI Constitution and the Covenant

Article XII of the NMI Constitution implements section 805 of the Covenant to Establish a Commonwealth in Political Union With the United States of America, *reprinted as amended in* 48 U.S.C.A. § 1681 note (West 1987) (Covenant). Section 805 provides that, notwithstanding fed-

**414**

eral law, the Commonwealth government shall regulate the alienation of local land to restrict the acquisition of long-term interests to persons of Northern Mariana Islands descent.[1] The avowed motive of the drafters was "to protect [the people] against exploitation and to promote their economic advancement and self-sufficiency" and to preserve the islanders' culture and traditions, which are uniquely tied to the land. Accordingly, Article XII, section 1 provides that

> [t]he acquisition of permanent and long-term interests in real property within the Commonwealth shall be restricted to persons of Northern Marianas descent.

Section 3 of that Article defines the restricted interests:

> The term permanent and long-term interests in real property used in Section 1 includes freehold interests and leasehold interests of more than forty years including renewal rights.[2]

Section 4 defines a person of Northern Marianas descent as one

> who is a citizen or national of the United States and who is of at least one-quarter Northern Marianas Chamorro or Northern Mariana Carolinian blood or a combination thereof or an adopted child of a person of Northern Marianas decent if adopted while under the age of eighteen years. For purposes of determining Northern Marianas descent, a person

shall be considered to be a full-blooded Northern Marianas Chamorro or Northern Marianas Carolinian if that person was born or domiciled in the Northern Mariana Islands by 1950 and was a citizen of the Trust Territory of the Pacific Islands before the termination of the Trusteeship with respect to the Commonwealth.[3]

Section 6 of Article XII provides in pertinent part that "[a]ny transaction made in violation of Section 1 shall be void ab initio."

### C. Proceedings below

On Wabol's motion for summary judgment, the trial court ruled that: (1) the lease violated Article XII, section 1; (2) Article XII did not violate the equal protection clause; but (3) in light of Wabol's "waiver, laches and estoppel" in allowing PGI to pay rent for almost seven years and construct extensive improvements on the property, the lease was valid for the forty year allowable term. In its equal protection analysis, the court applied a relaxed rational basis standard of review, drawing an analogy to decisions dealing with classifications favoring American Indians. The parties stipulated to judgment and appealed. The appellate division of the district court agreed that the lease was invalid, also applying minimal equal protection

---

1. Covenant section 805 provides:
   Except as otherwise provided in this Article, and notwithstanding the other provisions of this Covenant, or those provisions of the Constitution, treaties or laws of the United States applicable to the Northern Mariana Islands, the Government of the Northern Mariana Islands, in view of the importance of the ownership of land for the culture and traditions of the people of the Northern Mariana Islands, and in order to protect them against exploitation and to promote their economic advancement and self-sufficiency:
   (a) will until twenty-five years after the termination of the Trusteeship Agreement, and may thereafter, regulate the alienation of permanent and long-term interests in real property so as to restrict the acquisition of such interests to persons of Northern Mariana Islands descent; and
   (b) may regulate the extent to which a person may own or hold land which is now public land.

2. This section was amended in 1985 to define a long-term leasehold as one of more than fifty-five years. The amendment is nonretroactive.

3. Section 5 defines corporate persons eligible to purchase permanent and long-term interests:
   A corporation shall be considered to be a person of Northern Marianas descent so long as it is incorporated in the Commonwealth, has its principal place of business in the Commonwealth, has directors fifty-one percent of whom are persons of Northern Marianas descent and has voting shares at least fifty-one percent of which are owned by persons of Northern Marianas descent as defined by Section 4.
   Section 5 was amended in 1985 to raise the fifty-one percent provisions to one-hundred percent, and in other particulars not relevant here. It is undisputed that PGI is an ineligible corporation.

scrutiny. However, the district court rejected the trial court's implicit conclusion that section 6 permitted reformation of a nonconforming lease, and reversed. The case was remanded to the trial court for a determination of (1) the value of the improvements and (2) the extent of any rights arising in quasi contract or as the result of a periodic tenancy. This appeal timely followed.

## II. JURISDICTION

Preliminarily, we must determine whether the district court's remand order deprives us of jurisdiction over this appeal.[4] In addition, we must determine whether NMI Public Law 6–25 divests this court of jurisdiction over the appeal. We determine our jurisdiction *de novo. Schlegel v. Bebout*, 841 F.2d 937, 941 (9th Cir.1988).

### A. Finality of the Remand Order

■ It is axiomatic that our jurisdiction extends only to "final" judgments of the district court. However, we measure the finality of decisions of the appellate divisions of the district courts for Guam and the Commonwealth by analogy to the standard the Supreme Court applies in reviewing state court judgments under 28 U.S.C. § 1257. *See Guam v. Kingsbury*, 649 F.2d 740, 742 (9th Cir.1980), *cert. denied*, 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 210 (1981).

Clearly, the decision at hand is "not final in the strict sense of a decree that leaves nothing further to be addressed by the [local] courts." *American Export Lines, Inc. v. Alvez*, 446 U.S. 274, 277, 100 S.Ct. 1673, 1675, 64 L.Ed.2d 284 (1980). However, the Supreme Court in *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), described four categories of judgments with "sufficient characteristics of finality to warrant an assertion of ... appellate jurisdiction." *Alvez*, 446 U.S. at 277, 100 S.Ct. at 1675. *See Cox Broadcasting*, 420 U.S. at 477–87, 95 S.Ct. at 1037–42. We recently summarized the exceptions:

> The [Supreme] Court will review federal issues in state court cases even though further proceedings are pending when: (1) the federal issue is conclusive or the outcome is preordained; (2) the federal issue will survive the further proceedings and require adjudication; (3) the federal issue has been fully decided and review after remand might be precluded; (4) the federal issue has been fully decided and the case might be decided on nonfederal grounds below, but determination of the federal issue would immediately resolve the case and delaying review would erode federal policy.

*Kiaaina v. Jackson*, 851 F.2d 287, 289 (9th Cir.1988) (per curiam) (*citing Cox Broadcasting*, 420 U.S. at 479–83, 95 S.Ct. at 1038–40).

In applying the exceptions, we have frequently observed that the analogy is imprecise. *See Kiaaina, Id.; Guam v. Manibusan*, 729 F.2d 1236, 1238 (9th Cir.1984); *Guam v. Quinata*, 704 F.2d 1085, 1086 (9th Cir.1983); *see also Kingsbury*, 649 F.2d at 746–48 (Poole, J., dissenting). *Cox Broadcasting* accommodates the competing concerns of judicial efficiency, federalism and comity presented by Congress' grant of power under section 1257 to review questions of federal law decided by state courts. *Kiaaina*, 851 F.2d at 289. But these concerns are vastly different in the present context because our jurisdiction under 48 U.S.C. § 1694b(c) is plenary, extending to questions of local as well as federal law, and mandatory.[5] Accordingly, in *Kiaaina* we adjusted the exceptions to more accurately reflect the posture in which we receive cases under section 1694b(c). Thus,

---

**4.** A motions panel ordered PGI to show cause why the appeal should not be dismissed for want of a final judgment. PGI responded and the matter was referred to this panel for determination preliminary to the merits.

**5.** Thus, judicial efficiency, the primary rationale behind the final judgment rule, takes on added dimension. The pendency of *any* question remaining for decision presents the spectre of piecemeal review. And federalism and comity considerations are less relevant where, as here, both Congress and the Commonwealth have assigned federal courts a substantial role in developing Commonwealth law.

"[f]or purposes of the *Cox* analysis ... all issues are federal." *Id.*

*Kiaaina* further observed that, under this tightened analogy, "the first two *Cox* exceptions have little relevance in determining the finality of decisions of the Guam Appellate Division." *Id.* It is the second *Cox* exception—cases in which the federal issue "will survive and require decision regardless of the outcome of future state court proceedings," *Cox Broadcasting,* 420 U.S. at 480, 95 S.Ct. at 1038—upon which PGI principally relies here.

Despite *Kiaaina*'s observation that this exception has "little relevance" to our finality analysis, that court recognized the need to "review decisions from the Appellate Division of the district court of Guam [or, analogously, the Appellate Division of the district court of the Northern Mariana Islands] when further proceedings are pending ... if policy issues involved are of such importance as to demand immediate review, or declining to entertain the appeal would preclude further review." 851 F.2d at 290. As the court itself recognized, this test "parallels the 'practical finality' test applied by the Supreme Court in determining its appellate jurisdiction over federal cases." *Id.* at 290 n. 5 (*citing Gillespie v. United States Steel Corp.,* 379 U.S. 148, 152–53, 85 S.Ct. 308, 310–12, 13 L.Ed.2d 199 (1964)).

The "practical finality" test is satisfied when the following four factors are met: "(1) the case was a 'marginally final order,' (2) 'disposed of an unsettled issue of national significance,' (3) review 'implemented the same policy Congress sought to promote in § 1292(b),' and (4) the finality issue was not presented to the Supreme Court until argument on the merits, thereby ensuring that policies of judicial economy would not be served by remanding the case with an important unresolved issue." *In re Subpoena Served on Cal. Public Utilities Comm'n,* 813 F.2d 1473, 1480 (9th Cir.1987)

(*quoting Coopers & Lybrand v. Livesay,* 437 U.S. 463, 477 n. 30, 98 S.Ct. 2454, 2462 n. 30, 57 L.Ed.2d 351 (1978)).

We believe this case possesses sufficient characteristics of finality under this test to command our immediate attention. The challenged order is 'marginally final' because the pending proceedings have little substance and will not affect the potentially dispositive and obviously central issue— the validity under the federal constitution of the land alienation restrictions set forth in the Commonwealth constitution. Moreover, the order validating the racially based land restrictions under constitutional equal protection doctrine clearly "disposed of an unsettled issue of national significance" of critical importance to those inhabiting the territory and to those affected by any questions relating to the application of the Constitution to NMI. Review of the merits in this case is consistent with the policies underlying § 1292(b) in that immediate review is fundamental to the further conduct of the case. *See Gillespie,* 379 U.S. at 154, 85 S.Ct. at 312. If we find the restriction invalid, then the remand becomes unnecessary. If we uphold the restriction, there is little more than an accounting remaining for adjudication. Though the remaining issues could eventually ascend to this court, this alone should not prevent our adjudication of important and potentially dispositive questions which have been fully briefed and argued.[6] Such a result would disserve the cause of judicial economy and therefore frustrate the very purpose of the final judgment rule.[7]

Moreover, the Supreme Court, in accepting review of analogous appeals, has often pointed to the divisibility of the issue presented from the issues withheld. *See First English Evan. Luth. Ch. v. Los Angeles Cty.,* 482 U.S. 304, 309–10 n. 3, 107 S.Ct. 2378, 2383 n. 3, 96 L.Ed.2d 250 (1987) (whether county had taken petitioner's property, requiring just compensation, was

---

**6.** It is entirely possible that, if this court upholds the challenged restrictions, the issues of local law remaining would never be reviewable by this court. *See* NMI Public Law No. 6–25 and discussion at II.B, *infra.*

**7.** Significantly, our exercise of jurisdiction will not interfere with the course of the trial. The trial court purported to issue a final judgment. *See Quinata,* 704 F.2d at 1087.

distinct from the question whether flood control district was liable for damage to that property); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907 n. 42, 102 S.Ct. 3409, 3422 n. 42, 73 L.Ed.2d 1215 (1982) (pending recomputation of damages distinct from the federal liability issue); *Alvez*, 446 U.S. at 279, 100 S.Ct. at 1676 (existence of right of consortium under general maritime law unaffected by pending questions of negligence and unseaworthiness); *Brady v. Maryland*, 373 U.S. 83, 85 n. 1, 83 S.Ct. 1194, 1195 n. 1, 10 L.Ed.2d 215 (1963) (judgment sufficiently final because the question raised was " 'independent of, and unaffected by' what may transpire" on remand) (quoting *Radio Station WOW, Inc. v. Johnson*, 326 U.S. 120, 126, 65 S.Ct. 1475, 1479, 89 L.Ed. 2092 (1945)). Because the questions pending for initial decision are insubstantial and cannot affect the questions presented for review, we hold that the judgment is sufficiently final under *Kiaaina* to permit our review.

B.   Effect of Public Law No. 6–25

■ On May 2, 1989, almost one year after this appeal had been fully briefed, argued and submitted for disposition, the Commonwealth legislature enacted the Commonwealth Judicial Reorganization Act of 1989, Public Law No. 6–25, Section 3109 (the "Act"). The Act establishes a local appellate court, the NMI Supreme Court, and purports to divest all federal courts of jurisdiction over appeals, including those pending when the Act was passed, which involve cases originating in the local trial courts. NMI P.L. No. 6–25, § 3109(b). The newly established NMI Supreme Court has recently upheld the provisions divesting this court of jurisdiction over this appeal. *See Wabol v. Villacrusis*, No. 89–005 (Sup.Ct. NMI, Dec. 11, 1989). If we

decide that the Act does not operate to divest this court of jurisdiction over this appeal or, conversely, to vest such jurisdiction in the NMI Supreme Court, we need not give full faith and credit to the NMI court's judgment. *See Underwriters Nat. Assur. Co. v. North Carolina Life and Acc. and Health Ins. Guaranty Ass'n*, 455 U.S. 691, 102 S.Ct. 1357, 71 L.Ed.2d 558 (1982); *Nevada v. Hall*, 440 U.S. 410, 99 S.Ct. 1182, 59 L.Ed.2d 416 (1979), *reh. den.*, 441 U.S. 917, 99 S.Ct. 2018, 60 L.Ed.2d 389 (holding that no full faith and credit is warranted for decision rendered by court without jurisdiction). We must therefore independently determine whether the Act operates to divest this court of jurisdiction over this appeal.[8] We hold that it does not.

The Covenant, as implemented by Public Law No. 95–157, 91 Stat. 1266 (Nov. 8, 1977), established a district court for the District of NMI, which maintains original federal jurisdiction over cases involving federal questions, diversity, or bankruptcy. 48 U.S.C. § 1694a(a). The district court was further authorized to exercise original jurisdiction over cases involving issues of local law which NMI courts were not empowered by the NMI constitution or laws to decide. 48 U.S.C. § 1694a(b). In this latter capacity only, the district court is considered to be a local NMI court. *Id.* Otherwise, it is a federal court. 48 U.S.C. § 1694c(b).

The Covenant further provides that, until NMI established its own appellate court, the NMI legislature could authorize the district court to have appellate jurisdiction over case from the NMI trial courts, providing that, at a minimum, the district court would have appellate jurisdiction over such cases when federal issues were involved. 48 U.S.C. § 1694b(a).[9] Until the

---

**8.** In any event, if the NMI Supreme Court's jurisdictional decision in *Wabol* were to be given full faith and credit, this court would have appellate jurisdiction under section 403(a) of the Covenant (48 U.S.C. § 1694c(a)) to reconsider the NMI court's holding, which directly pertains to an issue of federal law (the validity of the Act's provisions under the Covenant). *See, infra*, note 10.

**9.** As originally enacted in 91 Stat. 1266, § 1694b(a) authorized the NMI legislature to grant appellate jurisdiction to the district court. This court, in *Sablan v. Santos*, 634 F.2d 1153 (9th Cir.1980), interpreted this section to allow NMI to determine the appellate jurisdiction of the district court over all cases involving issues of local law, including those originating in the district court. In 1984, the U.S. Congress clarified § 1694b(a) with an amendment permitting

Act was passed in May, 1989, NMI had no appellate court of its own, and all appeals from the local trial courts, including this one, were heard by the Appellate Division of the district court. *See* NMI P.L. No. 1–5 (1978); *Gioda v. Saipan Stevedoring Co., Inc.*, 855 F.2d 625 (9th Cir.1988). This court has jurisdiction over all appeals from the appellate division pursuant to section 403(b) of the Covenant, originally codified at 48 U.S.C. § 1694c(b), which provides that those sections of Title 28 of the U.S.Code applicable to Guam shall be applied to NMI. 28 U.S.C. § 1291 provides for Ninth Circuit jurisdiction over all appeals from the appellate division of the district court of Guam. Congress explicitly clarified section 403(b) by amending the implementing legislation in 1984 to provide that this court "shall have jurisdiction of appeals from all final decisions of the appellate division of the district court" of NMI. 48 U.S.C. § 1694b(c).

The Act established a local appellate court, revoking entirely the appellate jurisdiction of the district court. NMI P.L. No. 6–25, § 1. The Covenant clearly entitles the NMI legislature to determine which court(s) will hear direct appeals from its local trial courts. 48 U.S.C. § 1694b(a); *Gioda*, 855 F.2d at 628. The Covenant does, however, limit NMI's authority to restrict the jurisdiction of courts empowered to hear appeals from federal courts or involving issues of federal law.[10]

The Act expressly states that all federal courts, including this court and the United States Supreme Court, are divested of jur-

isdiction over all appeals from cases originating in the local trial courts that were pending when the Act was passed.[11] NMI P.L. No. 6–25, § 3109(b). The Act requires that all such appeals shall be heard exclusively by the new NMI Supreme Court. *Id.* Since this appeal was still "pending" in this court for the purposes of the Act, these provisions would clearly apply to divest this court of jurisdiction over this appeal unless the NMI legislature exceeded its authority and the provisions are invalid.

The NMI legislature's authority to establish a local appellate court is governed by section 402 of the Covenant, which was ratified by the U.S. Congress and codified at 48 U.S.C. § 1694b(a). Although section 402 clearly authorizes the NMI to bestow or withdraw appellate jurisdiction on or from the district court in cases originating in the local trial courts, nothing in that section or elsewhere in the Covenant authorizes the NMI to define or limit the jurisdiction of this court or the U.S. Supreme Court. Despite appellees' assertion that "[w]hen the root is cut, the branches fall", *Smallwood v. Gallardo*, 275 U.S. 56, 62, 48 S.Ct. 23, 24, 72 L.Ed. 152 (1927), authority over the appellate jurisdiction of the district court does not imply authority over this court. The cases relied on by appellees support only the principle that, once jurisdiction is withdrawn from a lower court, a *subsequent* appeal to a higher court will not save it from that withdrawal. Here, however, the appeal was pending in this court when the Act was passed, and had been properly taken from the appellate

NMI to determine only the appellate jurisdiction of the district court over cases in the local trial courts so that NMI could not determine the courts to which cases in the federal district court could be appealed. *See* Public Law No. 98–454, 98 Stat. 1744 (Oct. 5, 1984); *Gioda v. Saipan Stevedoring Co. Inc.*, 855 F.2d 625, 628 (9th Cir.1988).

**10.** Section 403(a) of the Covenant, codified at 48 U.S.C. § 1694c(a), mandates that, for 15 years after the establishment of a local appellate court, this court would maintain jurisdiction over appeals from such court involving federal law unless such cases are reviewable in the district court appellate division. We hold this section to be inapplicable to appeals, such as

this one, which were taken from the appellate division of the district court, and not from the local appellate court newly established by the Act. *See Camacho v. Civil Service Commission*, 666 F.2d 1257, 1261 (9th Cir.1982). We therefore find it unnecessary at this time to rule on the validity of the Act's attempt to measure the 15 year period from the passage of NMI P.L. No. 1–5, which implemented the Covenant section relating to the appellate jurisdiction of the district court, rather than from the passage of the 1989 Act, which first established a local appellate court.

**11.** The Act defines "pending" appeals as those appeals for which the final mandate of the court hearing them has not issued.

division before that court was divested of jurisdiction. Furthermore, when Congress amended the implementing legislation in 1984 to clarify this court's misinterpretation of section 402(c) of the Covenant in *Sablan v. Santos*, it made clear its original intent that NMI would not have the authority to determine which courts would be empowered to hear appeals from federal courts. *See Gioda*, 855 F.2d at 628; 130 Cong.Rec. at S23792 (Sept. 14, 1984) (Senator Weicker explained that section 402(c) of the Covenant, allowing NMI to define the appellate jurisdiction of the district court, means only "that the laws of the Northern Mariana Islands may restrict the right of appeal [from local trial courts], not that a local legislature can determine the court to which the decisions of a federal court may be appealed."). Moreover, nothing in the Covenant can be construed to grant authority to NMI to amend or circumvent the express provision that all appeals from the appellate division of the district court must be heard by this court, without limitation.[12] 48 U.S.C. § 1694b(c).

The Act's attempt to divest this court of jurisdiction over an appeal properly taken from the appellate division of the district court is an exercise of precisely the kind of authority Congress has withheld from NMI and is in direct contradiction with section 1694b(c). Although NMI may clearly determine whether a federal court or a newly established appellate court may entertain

appeals from a local trial court, Congress has expressly established that NMI is not authorized to make such determinations relating to appeals from a federal court.[13] The Act, by establishing a local Supreme Court, does not alter the federal nature of the appellate division of the district court. *See Camacho v. Civil Service Commission*, 666 F.2d 1257, 1261 (9th Cir.1982) (the appellate division "does not become transmuted into a court of the NMI merely because the NMI granted the court some discretion it could have withheld.").

Therefore, although the Act by its terms applies retroactively to appeals from local trial courts which were pending in the appellate division of the district court when it was passed (*see Gioda*, 855 F.2d at 627), NMI is without power under the Covenant to divest this court of jurisdiction over appeals properly filed from a final order of the appellate division of the district court entered before the passage of the Act.

Since this appeal challenges a final order entered by the appellate division of the district court before May 2, 1989, the Act is without authority to divest this court of jurisdiction over the appeal.

## III. MERITS

PGI seeks to avoid the cancellation of its lease by (1) attacking the validity of the constitutional restriction on equal protec-

---

**12.** Although § 1694b(c) was enacted subsequent to the Covenant as part of the 1984 amendments, it is entirely consistent with, and appears to be a clarification of, section 403(b) of the original Covenant, codified at 48 U.S.C. § 1694c(b), which provides that those sections of Title 28 of the U.S.Code applicable to Guam shall be applied to NMI. 28 U.S.C. § 1291, providing for Ninth Circuit review of judgments of the appellate division of the district court of Guam thus applies to judgments of the appellate division of the district court for the NMI. *Camacho*, 666 F.2d at 1260; *Atalig*, 723 F.2d at 686–87. This interpretation in *Camacho* was affirmed by Congress in the 1984 amendments, which were enacted in part to clarify the questions raised by *Sablan*, including questions relating to the jurisdiction of this court over appellate division judgments involving solely local issues. *See* 130 Cong.Rec. at S23792 (Sept. 14, 1984). *Atalig* does not provide support for NMI's attempt to define and limit this court's

jurisdiction. This court held in *Atalig* that, *because* section 403(b) of the Covenant, implemented at § 1694b(c), bestowed jurisdiction on this court over appeals from the appellate division of the district court, NMI could authorize its government to appeal from criminal cases in the appellate division. Thus, this court relied solely on the jurisdiction granted to it under the Covenant, and has never authorized NMI to unilaterally define its jurisdiction.

**13.** In signing the Act into law, the NMI governor himself expressed concern that the legislature had exceeded its power in seeking to divest this court and the United States Supreme Court of jurisdiction over pending appeals. Letter of May 2, 1989 from Governor Tenorio to Senate President Manglona and House Speaker Guerrero, accompanying the signed Act (finding that "the attempt to transfer jurisdiction of cases which are currently before the Ninth Circuit and U.S. Supreme Court is questionable").

tion grounds, and (2) attacking the district court's conclusion that Article XII, section 6 of the NMI Constitution prohibits the reformation of a lease violating section 1 of that Article.

### A. Validity of the land alienation restrictions

We review constitutional questions de novo. *Carreras v. City of Anaheim,* 768 F.2d 1039, 1042 n. 2 (9th Cir.1985).

A proper understanding of the problem, and our resolution, requires a brief digression into the relationship between the Commonwealth and the United States. Prior to 1947, the NMI endured years of foreign occupation and, eventually, experienced substantial devastation as a battleground in World War II. In 1947, pursuant to a Trusteeship Agreement with the United Nations, the United States became Administrator of the Trust Territory of the Pacific Islands, including NMI, with full powers of administration, legislation and jurisdiction. Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, art. 3, 61 Stat. 3301, T.I.A.S. No. 1665, 8 U.N.T.S. 189 (Trusteeship Agreement); *See Atalig,* 723 F.2d at 684. The administration of the Trust Territory was subject to United Nations supervision and circumscribed by the United Nations Charter and the terms of the Trusteeship Agreement. *See generally Gale v. Andrus,* 643 F.2d 826, 830 (D.C.Cir.1980). The United States was not a sovereign over, but a trustee for the Trust Territory. *See Ngiraingas v. Sanchez,* 849 F.2d 372, 375 n. 1 (9th Cir.1988); *People of Saipan v. United States Dep't of Interior,* 502 F.2d 90, 96–97 (9th Cir.1974), *cert. denied,* 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975). Briefly stated, the Trusteeship Agreement directed the United States to promote the inhabitants' independence and self-government, to protect them "against the loss of their lands" and resources, and to "protect the rights and fundamental freedoms of all elements of the population

without discrimination." Trusteeship Agreement art. 6, §§ 2, 3. Accordingly, the United States set up local government and negotiated with representatives of the inhabitants to establish a permanent political status. Much of the Trust Territory opted for a status of "free association;" because NMI expressed different aspirations, the United States began separate negotiations with the Marianas Political Status Commission for the people of the Northern Mariana Islands in 1972. That effort culminated in the 1975 execution of the Covenant. The Covenant was subsequently approved by the district legislature, a plebiscite of the people, and the United States Congress, and became law in March 1976. Act of Mar. 24, 1976, Pub.L. No. 94–241, 90 Stat. 263, *reprinted in* 48 U.S.C. § 1681 note. *See Atalig,* 723 F.2d at 685; Willens & Siemer, *The Constitution of the Northern Mariana Islands: Constitutional Principles and Innovation in a Pacific Setting,* 65 Geo.L.J. 1373, 1381–83 (1977). The Covenant defines the relationship between the Commonwealth and the United States, sets up a framework and set of mandates for the Commonwealth Constitution, and provides for the eventual termination of the trusteeship. It provides that, upon termination of the Trusteeship Agreement, the local citizens may become citizens of the United States and the NMI becomes politically united with and "under the sovereignty of the United States of America."[14] Covenant §§ 301, 101.

Pursuant to section 201 of the Covenant, the Commonwealth held a convention and drafted a constitution which was ratified by the people in March 1977. Pursuant to section 202, it was approved by President Carter in October 1977. Proclamation No. 4534, Fed.Reg. 56,593 (1977).

It appears that in approving the Covenant and the Commonwealth Constitution, the federal government was potentially constrained by both the Trusteeship Agreement and the United States Constitution. PGI, however, relies solely on the United States Constitution to avoid the land alien-

---

**14.** The Trusteeship was terminated on November 3, 1986. Proclamation No. 5564, 51 Fed. Reg. 40,399 (1986). *See Holmes v. Director of Revenue and Taxation,* 827 F.2d 1243, 1244 (9th Cir.1987).

ation restriction.[15]  We limit our decision to that issue.

■  Determination of the constitutionality of Article XII necessarily implicates the validity of Covenant section 805, which it implements, and Covenant section 501(b), because both seek to excuse section 805 from federal constitutional restrictions.[16] This is so because Congress' powers derive from and are defined and limited by the Constitution.  *See Boos v. Barry*, 485 U.S. 312, 108 S.Ct. 1157, 1165, 99 L.Ed.2d 333 (1988);  *Reid v. Covert*, 354 U.S. 1, 6, 77 S.Ct. 1222, 1225, 1 L.Ed.2d 1148 (1957). Thus the threshold inquiry, essentially, is the same as that presented in *Atalig*—whether Congress could, under the territories clause,[17] properly exclude the particular provision of the United States Constitution from operation in the Commonwealth.  Put another way, did Congress exceed its powers under Article IV, section 3 by insulating section 805 from the reach of the equal protection clause?

It is well established that the entire Constitution applies to a United States territory *ex proprio vigore*—of its own force— only if that territory is "incorporated."[18] Elsewhere, absent congressional extension, only "fundamental" constitutional rights apply in the territory.  *Balzac v. Porto Rico*, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922);  *Atalig*, 723 F.2d at 688.  *See Examining Bd. v. Flores de Otero*, 426 U.S. 572, 599–600 n. 30, 96 S.Ct. 2264, 2280 n. 30, 49 L.Ed.2d 65 (1976).  Therefore, the question further reduces to this:  Is the right of equal access to long-term interests in Commonwealth real estate, resident in the equal protection clause, a fundamental one which is beyond Congress' power to exclude from operation in the territory under Article IV, section 3?

In *Atalig*, a criminal defendant prosecuted in the Commonwealth sought the protections of the Sixth Amendment right to trial by jury, arguing that in *Duncan v. Louisiana*, 391 U.S. 145, 149–50 n. 14, 88 S.Ct. 1444, 1447 n. 14, 20 L.Ed.2d 491 (1968), the Supreme Court had settled the question by holding that the right was fundamental and incorporated within the Fourteenth Amendment.  This court rejected the broad proposition that those guarantees incorporated into the Fourteenth Amendment for application to the states must also be incorporated into the territory clause for application to the Commonwealth.  What is fundamental for purposes of Fourteenth Amendment incorporation is that which "is necessary to an Anglo–American regime of ordered liberty." *Duncan*, 391 U.S. at 149–50 n. 14, 88 S.Ct. at 1447 n. 14.  In contrast, "fundamental" within the territory clause are " 'those ... limitations in favor of personal rights' which are 'the basis of all free government.' " *Atalig*, 723 F.2d at 690 (quoting *Dorr v. United States*, 195 U.S. 138, 146, 147, 24 S.Ct. 808, 811–12, 812, 49 L.Ed. 128 (1904)).  In the territorial context, the definition of a basic and integral freedom must narrow to incorporate the shared beliefs of diverse cultures.  Thus, the asserted constitutional guarantee against discrimination

**15.**  As we have noted, Article 6 of the Trusteeship Agreement prohibits discrimination against any inhabitants of the Trust Territory in the exercise of their rights and fundamental freedoms.  In *People of Saipan*, 502 F.2d at 96–97, we held that the Trusteeship Agreement created judicially enforceable individual rights.  Because PGI does not argue that the land alienation restrictions violate the Trusteeship Agreement, we express no opinion on the question.

**16.**  Section 501(b) provides in pertinent part:

(b) The applicability of certain provisions of the Constitution of the United States to the Northern Mariana Islands will be without prejudice to the validity of and the power of the Congress of the United States to consent to Section [805]....

Article 3 of the Trusteeship Agreement authorized the United States to "apply to the Trust territory ... such of the laws of the United States as it may deem appropriate to local conditions and requirements."

**17.**  Under Article IV, section 3 of the United States Constitution, Congress may "dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States."

**18.**  A territory is incorporated if it was intended for statehood from the time of acquisition. *Atalig*, 723 F.2d at 688.  It is undisputed that the Commonwealth is not an incorporated territory, though the precise status of the Commonwealth is far from clear.  *See id.* at 691 & n. 28.

in the acquisition of long-term interests in land applies only if this guarantee is fundamental in this *international* sense.

No court has yet confronted this particular question. Rather, this narrower definition of fundamentalness has been considered mostly with respect to the jury trial right. *E.g., Atalig, see also King v. Morton,* 520 F.2d 1140 (D.C.Cir.1975). That is a distinguishable question. The jury trial guarantee is primarily a procedural right designed to safeguard the broader and more fundamental right to a fair trial protected by the due process clauses. So viewed, it is "easy to imagine" a system that omits the safeguard, but, through other mechanisms, nevertheless achieves the broader, nonwaivable goal of assuring a fundamentally fair trial. *Duncan,* 391 U.S. at 150, 88 S.Ct. at 1448; *Atalig,* 723 F.2d at 690. In contrast, equal protection of the laws regarding access to long-term interests in real property is a substantive right which either does or does not apply.[19]

Nevertheless, we discern certain principles in *Atalig* and *King* which provide guidance. In *Atalig,* we distinguished Fourteenth Amendment and territorial incorporation by reference to their distinct purposes. Whereas the former "serves to fix our basic federal structure[,] the latter is designed to limit the power of Congress to administer territories under Article IV of the Constitution." *Atalig,* 723 F.2d at 689. The incorporation analysis thus must be undertaken with an eye toward preserving Congress' ability to accommodate the unique social and cultural conditions and values of the particular territory. Moreover, we must be cautious in restricting Congress' power in this area. *Id.* at 690. *See also Torres v. Puerto Rico,* 442 U.S. 465, 469–70, 99 S.Ct. 2425, 2428–29, 61 L.Ed.2d 1 (1979).

*King* adopted a similar, though more explicit approach. In setting forth principles for the district court to follow in deciding whether the right to a trial by jury must be accorded in American Samoa, the test was formulated as follows:

> As Mr. Justice Harlan wrote in *Reid v. Covert,* "the particular local setting, the practical necessities, and the possible alternatives are relevant to a question of judgment, namely, whether jury trial *should* be deemed a necessary condition of the exercise of Congress' power to provide for the trial of Americans overseas."
>
> The importance of the constitutional right at stake makes it essential that a decision ... rest on a solid understanding of [present conditions in the territory]. That understanding cannot be based on unsubstantiated opinion; it must be based on facts.... In short, the question is whether in [the territory] "circumstances are such that trial by jury would be impractical and anomalous." *Reid v. Covert,* 354 U.S. [1] at 75, 77 S.Ct. [1222] at 1260 [1 L.Ed.2d 1148 (1957)] [Harlan, J., concurring].

*King,* 520 F.2d at 1147 (citations omitted). In our view, *King* sets forth a workable standard for finding a delicate balance between local diversity and constitutional command, and one which is consistent with the principles we stressed in *Atalig.* We therefore consider whether the claimed right is one which would be impractical or anomalous in NMI. We conclude that Wabol has carried its burden of demonstrating that this particular constitutional guarantee would be impractical and anomalous in the Commonwealth and therefore should not be imposed.

There can be no doubt that land in the Commonwealth is a scarce and precious resource. Nor can the vital role native ownership of land plays in the preservation of NMI social and cultural stability be underestimated. *See* L. Gurrero, *Analysis of the Constitution of the Commonwealth of the Northern Mariana Islands* 174–76

---

19. It is important to distinguish between the right claimed under the equal protection clause and the right to equal protection itself. *Atalig* held that not every right subsumed within the due process clause can ride the fundamental coattails of due process into the territories. The same must be true of the equal protection clause. It is the specific right of equality that must be considered for purposes of territorial incorporation, rather than the broad general guarantee of equal protection.

(Dec. 6, 1976) (Unpublished manuscript). Land is the only significant asset of the Commonwealth people and "is the basis of family organization in the islands. It traditionally passes from generation to generation creating family identity and contributing to the economic well-being of family members." *Id.* at 175. It appears that land is principally important in the Commonwealth not for its economic value but for its stabilizing effect on the natives' social system. *Id.* The land alienation restrictions are properly viewed as an attempt, albeit a paternalistic one, to prevent the inhabitants from selling their cultural anchor for short-term economic gain, thereby protecting local culture and values and preventing exploitation of the inexperienced islanders at the hands of resourceful and comparatively wealthy outside investors. *See* Willens & Siemer, 65 Geo.L.J. at 1406. The legislative history of the Covenant and the Constitution indicate that the political union of the Commonwealth and the United States could not have been accomplished without the restrictions. *See* Marianas Political Status Commission, Report of the Joint Drafting Committee 3 (1975), *reprinted in Hearing to Approve "The Covenant to Establish a Commonwealth of the Northern Mariana Islands" Before the Subcomm. on Territorial and Insular Affairs of the House Comm. on Interior and Insular Affairs*, 94th Cong., 1st Sess. 376 (1975); *see also* Willens & Siemer, *supra*, at 1406–07. Section 805 is a "fundamental provision[ ] of th[e] Covenant" which may be modified only with the mutual consent of the governments of the Commonwealth and the United States. Covenant § 105. And we must be mindful also that the preservation of local culture and land is more than mere desideratum— it is a solemn and binding undertaking memorialized in the Trusteeship Agreement.

PGI does not contest the compelling justification for the restrictions. Rather, it attacks only the precision with which the restrictions operate to further these interests. This attack would have substantial force in an equal protection analysis, but it is of only minimal relevance to the threshold question of the validity of the Congressional waiver of equal protection restraints in sections 501(b) and 805.[20] A restriction need not be precisely tailored to qualify for exemption from equal protection scrutiny. It is therefore relevant, but not dispositive, that the restrictions only apply to freeholds and leaseholds of more than 40 years duration, or that they might have been drawn more narrowly to accomplish their goals.

We think it clear that interposing this constitutional provision would be both impractical and anomalous in this setting. Absent the alienation restriction, the political union would not be possible. Thus, application of the constitutional right could ultimately frustrate the mutual interests that led to the Covenant. It would also hamper the United States' ability to form political alliances and acquire necessary military outposts. *Cf. Torres*, 442 U.S. at 469–70, 99 S.Ct. at 2428–29. For the NMI people, the equalization of access would be a hollow victory if it led to the loss of their land, their cultural and social identity, and the benefits of United States sovereignty.[21] It would truly be anomalous to construe the equal protection clause to force the United States to break its pledge to preserve and protect NMI culture and property. The Bill of Rights was not intended to interfere with the performance of our international obligations. Nor was it intended to operate as a genocide pact for diverse native cultures. *See* Laughlin, 2 U.Haw.L. Rev. at 386–88. Its bold purpose was to protect minority rights, not to enforce hom-

---

**20.** Specifically, we consider this probative of the genuineness of the interest raised to justify deviation from the norm of constitutional application. The looser the fit, the more likely the asserted interest is mere pretext. Also, the harsher the impact on the individual resulting from the waiver of the constitutional protection, the greater the showing of interference with important government interests must be made to justify that waiver.

**21.** As one commentator has observed, free alienation is impractical in this situation not because it would not work, but because it would work too well. *See* Laughlin, *The Application of the Constitution in United States Territories: American Samoa, A Case Study*, 2 U.Haw.L.Rev. 337, 386 (1980).

ogeneity. Where land is so scarce, so precious, and so vulnerable to economic predation, it is understandable that the islanders' vision does not precisely coincide with mainland attitudes toward property and our commitment to the ideal of equal opportunity in its acquisition. We cannot say that this particular aspect of equality is fundamental in the international sense. It therefore does not apply *ex proprio vigore* to the Commonwealth. Accordingly, Congress acted within its power in enacting sections 501(b) and 805 of the Covenant, and Article XII is not subject to equal protection attack. We hold that the appellate division of the district court for the Northern Mariana Islands did not err in upholding Article XII of the Commonwealth Constitution against PGI's constitutional challenge.[22]

### B. Availability of reformation

 The district court's conclusion that Article XII, section 6 precludes reformation of a lease agreement which violates the terms of section 1 is a question of law reviewed de novo. *Guam v. Yang*, 850 F.2d 507, 511 (9th Cir.1988) (en banc). Section 6 reads in pertinent part:

> *Enforcement.*
>
> Any Transaction made in violation of Section 1 shall be void ab initio.

The district court held simply that the constitution means what it says. We agree. The drafters' intent could not be clearer; any transaction which violates section 1 is completely without force and effect. The language of section 6 admits of no equitable exceptions. "[T]he most basic rule of statutory construction is that the plain language of the statute should be regarded as conclusive." *Fleming v. Department of Public Safety*, 837 F.2d 401, 405–06 (9th

Cir.1988). The legislative history reinforces our conclusion. *See* Gurrero, *supra*, at 187:

> This section provides that any transaction made in violation of section 1 is void from the beginning and has no force or effect. This means that if a person sells land to a person who is not of Northern Marianas descent, that transaction never takes effect and never has any consequence with respect to the title of the land. The title remains in the person who tried to sell it.[23]

In light of this clear and unequivocal language and legislative history, we conclude that the lease was void ab initio. Because a void instrument cannot be reformed, *Hedges v. Dixon County*, 150 U.S. 182, 192, 14 S.Ct. 71, 74–75, 37 L.Ed. 1044 (1893), the district court properly held that the lease was invalid.

### IV. CONCLUSION

We conclude that (1) the judgment of the Appellate Division of the District court for the Northern Mariana Islands is sufficiently final to support our jurisdiction under 48 U.S.C. § 1694b(c); (2) NMI Public Law No. 6–25 does not operate to divest this court of jurisdiction over this appeal; (3) the land alienation restrictions of Article XII of the Commonwealth Constitution are not subject to equal protection analysis; and (4) a lease which violates the terms of Article XII cannot be reformed. Accordingly, we affirm the district court in all respects and remand this case for further proceedings.

**AFFIRMED and REMANDED.**

---

**22.** The district court's conclusion that equal protection analysis was applicable was error. We express no view as to the soundness of its application of equal protection principles. We exercise our duty to pass on the result, not the reasoning of the district court's decision, and to affirm on any ground supported by the record. *See City of Las Vegas v. Clark County*, 755 F.2d 697, 701 (9th Cir.1985).

**23.** On its face, section 6 appears to invite overreaching by lessors, for they can use the threat of enforcement to force renegotiation and prey

upon the potential disruption of the lessee's expectations and investment. In fact, PGI argues that Wabol is doing just that. This was the basis for the trial court's attempt to reform the lease. If this is so, however, the proper forum for PGI's complaint is the political arena. On remand, the trial court may adjust the equities of the situation by compensating PGI for the amount expended in improving the property. *See* Gurrero at 187 (section 6 affects title only; it does not prevent an action for unjust enrichment or other rights arising in contract).